L. EVERETT MOORE et al., Appellees, v. MEMPHIS
STONE & GRAVEL COMPANY and JOE SHANK-
MAN, Individually and as Trustee, Appellants. —339
S. W. (2d) 29.

Western Section.  December 21, 1959.

Certiorari Denied by Supreme Court April 6, 1960.

462

Exby, Moriarty & Goff, Memphis, for appellants.

Richard T. Ely, Sam J. Cantanzaro, Jr., Memphis, for appellees.

CARNEY, J.  Defendants below, Memphis Stone & Gravel Company and Joe Shankman, appeal from the Chancellor's action in sustaining complainants' bill and ordering an injunction restraining Memphis Stone and Gravel Company, as lessee, and Joe Shankman, as lessor and owner, from excavating and mining gravel from the Shankman property on the grounds that such mining operations were in violation of the "Five mile County-City Zoning Regulations" passed by the joint action of Shelby County and the City of Memphis pursuant to authority of Chapter 613 of the Private Acts of the General Assembly of Tennessee for the year 1931.  The complainants are property owners generally residing on the Raleigh-Bartlett road east of its intersection with the Covington pike and on the Covington pike south of its intersection with the Raleigh-Bartlett road.  This area is located in Shelby County, Tennessee, outside but within five miles of the city limits of Memphis, Tennessee.

The area is well-developed as residential property though the area is zoned under Section 7 of the Zoning Ordinance as an agricultural district. (Exhibit 4.)

The defendant, Joe Shankman, owns approximately 65 acres of land located immediately south of residences fronting on the south side of the Raleigh-Bartlett road which runs east and west and immediately east of the residences fronting on the east side of the Covington pike which runs north and south.

By contract dated June 3, 1958, the defendant, Joe Shankman, executed a lease authorizing the defendant, Memphis Stone and Gravel Company, to mine sand and gravel from said property.

By letter dated October 15, 1958, addressed to the chairman and members of the Board of Commissioners of Shelby County, Tennessee, Memphis Stone and Gravel Company requested a permit "to extract sand, gravel, top soil and other natural resources from land owned by Joe Shankman and leased to applicant." The letter further described the location of the real estate in detail and recited that the mining operations would be located some 700 feet off the Raleigh-Bartlett road and that said operations would be almost unobserved from the road. Attached to said letter of Memphis Stone and Gravel Company was a formal application for permit on a regular form furnished for such purposes.

We copy the salient portions of said application as follows:

"Application for Use and Occupancy Permit and
Building Permit

"County of Shelby

"Office of

"County Building Commissioner

"Application is hereby made for a use and occupancy permit under the provisions of a joint ordinance and resolution of the Board of Commissioners of the City of Memphis and the Shelby County Court zoning the territory outside of the corporate limits of the City of Memphis, and the undersigned applicant hereby represents that all answers to questions herein propounded and maps and drawings attached are true; that the permit applied for, if granted, is granted on the representation herein made; and that any permit issued hereunder may be revoked without notice on any breach of representation or condition:

Premises located on the South side of Raleigh-Bartlett road 500 feet West of Chaucer Lane and known as House No. 5359 Name of Subdivision ———— Lot No. ———— Name of owner of premises (lot, parcel or tract) Joe Shankman

Address ————————————— Tel. ——————
To be occupied by owner ————————— Tenant
——————————— For Sale ———————
Address Memphis Stone & Gravel Co., as tenant
Tel. ——————— Present Use ——————— Vacant
——————————— Use under permit to be To extract sand, gravel, top soil & other natural resources

Route in transporting materials in accordance with attached letter

\*      \*      \*      \*      \*      \*      \*

"Buildings

no buildings

\*      \*      \*      \*      \*      \*      \*

"Estimated cost of total improvements contemplated $ no construction cost

\*      \*      \*      \*      \*      \*      \*

"Date construction to be started immediately.

"If This Building Is Not Started In Six Months, This Permit Is Void.

"It is understood that any permit issued on this application will not grant any right or privilege to erect any structure or to use the premises herein described for any purpose that is prohibited by the Zoning Regulations.

"All provisions of the ordinance and resolution governing the use of property and the height, area and bulk of buildings will be complied with whether herein specified or not except any variations ordered by the Shelby County Board of Adjustment.

"Dated at Memphis, Tennessee, this 16 day of Oct., 1958.

> "/s/ Herbert B. Moriarty
> (Owner or Authorized Agent)
> Atty. for Memphis Stone &
> Gravel Co.

"Permit refused—Reason ——————

Permit granted by Board of Adjustment, Yes ——

No —— Date ————

Permit No. 50,166      Wm. J. Bussjaeger

Permit Cost $2.00''     County Building Commissioner

A receipt for the $2 application fee was issued on October 16, 1958, reciting that the permit was issued by Lelia Edwards for William J. Bussjaeger, County Building Commissioner.

Memphis Stone and Gravel Company, immediately after receipt of the permit, moved onto the property and began mining operations. Generally speaking in this case the removal of the sand and gravel is accomplished by digging and pushing aside the overburden of dirt ranging from fifteen to twenty feet deep and then excavating and removing the sand and gravel deposits by means of a crane and shovel. The shovelfuls of sands and gravel are dropped through a screen to remove the larger lumps into dump trucks and then hauled away to stock piles or construction jobs throughout Shelby County.

On November 12, 1958, the complainant landowners filed the present suit seeking an injunction against the defendants on two grounds: (1) That the mining operations and the attendant noise and dust therefrom along with the traffic hazard of the gravel trucks going to and from the pit constituted an actionable common law nuisance which should be abated and (2) that the defendants were mining gravel in violation of the Five Mile County-City Zoning Ordinance.

As to the nuisance feature of complainants' bill we quote from the Chancellor's finding as follows:

"The complainants complain that the actions and operations of the defendants constitute a common law nuisance due to excessive noises of heavy machinery and dust, dirt, and gravel being thrown upon and over the property of the surrounding owners, including the complainants; the operations of the defendants constitute a safety hazard to traffic using the surrounding roads; that the pits which will result from excavations will have water in them and will be an attractive nuisance to the children of the complainants and others; and the operations will result in depreciating values of the surrounding real property.

"The proof does evidence that the operations complained of do, and will, occasion noise, dust and dirt and the proof further evidences that gravel mining operations previously conducted south of the Raleigh-Bartlett Road and west of the Covington Pike have left property in a wasted condition pitted with abandoned excavations in which water accumulates and stands.

"The proof further evidences that the gravel mining operation at this time conducted on the Shankman property has depreciated property values in the immediate area in which the gravel operations are conducted. No one, believes the Court, would argue that a gravel mining operation, almost in a person's back yard, is a desirable neighbor.

"However, the proof does not evidence noise, dirt, or dust or any hazard in excess of that normally to

be expected from such an operation, and if the operation is legal in nature and conducted in a lawful manner the inconvenience of such an operation is one of the burdens of a community which a Court may not lift and depreciation in property values from such operation is damnum absque injuria. Furthermore, the Court does not consider that injunctive powers may be properly employed to prevent what in the future may or might become an attractive nuisance because of a condition in which the Shankman property may or might be left upon the cessation of the gravel mining operation.

"Under the proof, the Court cannot sustain the complainant's position that the gravel mining operation, as conducted, amounts to a common law nuisance."

The complainants have not appealed from the Chancellor's finding that the mining operations did not constitute a nuisance and therefore, we do not refer further to this phase of the complainants' bill.

The appellants have assigned error to the action of the Chancellor in holding that the defendants' operations were in violation of the Five Mile County-City Zoning Regulations and in issuing an injunction against them. Appellants insist that the action of the Chancellor was erroneous in two aspects:

(a) "Because the defendant, Memphis Stone and Gravel Company, obtained a vested interest in said permit issued by the County Building Commissioner on October 16, 1958, by reason of its having expended large sums of money in reliance upon said permit, in full force and effect, uncancelled, unrevoked, and

unappealed from from the date of its issuance on October 16, 1958, to the date of the trial of this cause on March 23, 1959, * * *.''

(b) ''Because the ordinance is unreasonable and void, in that it is in violation of the zoning laws and Constitution of the State of Tennessee and the Constitution of the United States of America, insofar as it undertakes to prohibit, rather than regulate, the use by the defendant Shankman of his land for the excavation of gravel therefrom.''

Under sub-paragraph (a) the appellants rely very strongly upon the language of our Supreme Court of Tennessee in the case of Howe Realty Company v. City of Nashville, 1939, 176 Tenn. 405, 141 S. W. (2d) 904, 905. In the Howe Realty case the owner of real estate which was then zoned ''Commercial B District'' had leased said property for the construction of a gasoline filling station. On July 31, 1939, the lease agreement was concluded and a building contractor on the same day applied for and received from the assistant building supervisor a permit for the erection of a filling station on this property.

The residents of the area were opposed to this commercial venture, apparently complained to the city officials, and on the same day, July 21, 1939, the building supervisor or his representative sought the return of the building permit which was refused by the landowner or the building contractor. Work continued throughout July 31, 1939, and notice was given the landowner and lessee that a resolution would be introduced in the city council seeking to rezone the particular area and prevent the use of said property as a filling station. By agree-

ment work was stopped immediately on the project pending final determination.

Apparently the property was rezoned and the landowner went to court claiming a vested right under the building permit which had been issued to him. The Supreme Court held that the building supervisor had, under the zoning ordinance, authority to recall a permit and affirmed the judgment of the Chancellor which held adversely to the complainant landowner.

On the question of the vested right of the holder of a building permit we quote extensively from the opinion of Judge McKinney in the Howe Realty case as follows:

"The general rule, supported by numerous decisions, is thus stated in 43 C. J. 349:

" 'As a general rule, a building permit has none of the elements of a contract and may be changed or entirely revoked, even though based on a valuable consideration, if it becomes necessary so to change or revoke it in the exercise of the police power. Applicant's property is not exempt from the operation of subsequent ordinances and regulations legally enacted by the corporation, as for instance, his property may be subject to an ordinance or regulations extending the fire limits. But when once the proper authorities grant a permit for the erection or alteration of a structure, after applicant has made contracts and incurred liabilities thereon, he acquires a kind of property right on which he is entitled to protection; and under such circumstances it is generally held that the permit cannot be revoked without cause or in the absence of any public necessity for such action.'

"Some of the leading cases supporting the foregoing text are Brett v. Building Commissioner of Brookline, 250 Mass. 73, 145 N. E. 269; Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 184 N. W. 823, 188 N. W. 921, 23 A. L. R. 1322; State v. Rendigs, 98 Ohio St. 251, 120 N. E. 836; City of Lansing v. Dawley, 247 Mich. 394, 225 N. W. 500; People ex rel. Publicity Leasing Co. v. Ludwig, 218 N. Y. 540, 113 N. E. 532; Wheat v. Barrett, 210 Cal. 193, 290 P. 1033; Kingshighway Presbyterian Church v. Sun Realty Co., 324 Mo. 510, 24 S. W. (2d) 108; Geneva Investment Co. v. City of St. Louis, Mo., 8 Cir., 87 F. (2d) 83; Standard Oil Co. v. City of Minneapolis, 163 Minn. 418, 204 N. W. 165. In fact, we find no cases expressing a contrary view.

"Mr. Metzenbaum in his work on The Law of Zoning, pages 284, 285, after referring to the fact that there is some conflict in the decisions, makes this statement:

" 'Furthermore, the question of the degree to which actual construction may have progressed under the permit, appears to play a very important part in the attitude of the courts, in determining the propriety and equitableness of sustaining a revocation of such a permit.'

"It is with respect to the degree of construction that the courts differ. Perhaps the weight of authority supports the conclusions of the Supreme Court of Massachusetts in Brett v. Building Commissioner of Brookline, supra, in which Chief Justice Rugg says (250 Mass. 73, 145 N. E. 271): 'Since the petitioners had only barely begun work pursuant

to their permits, they had acquired no vested rights against a change in the by-law by the exercise of the law-making power.'

"Some of the authorities say the permit cannot be recalled where a 'substantial part' of the work of construction has been performed. It is unnecessary for us to determine in this cause the extent of construction necessary to constitute a vested right since there has been no construction.

"Some of the cases also hold that the enactment of such an ordinance as the one under consideration impliedly revokes a permit where, pursuant thereto, the owner has incurred no liability.

"Ordinance No. 871, dividing the city into zones, was enacted by virtue of the authority vested in the city by Chapter 209, Private Acts of 1925. Counsel for complainant, in denying the right of the supervisor of buildings to recall the permit issued by his assistant, invokes the following provision in subsection 8 of Section 2 of said Act:

" 'Nothing in this Act shall be taken to prevent:

" ' (a) The erection of a building for which a permit shall have been issued previous to the passage of an ordinance under the provisions of this Act.'

"The learned chancellor held that 'this provision has relation to permits issued before this amendment was enacted and before Ordinance No. 871 was adopted by the City Council of Nashville.' Whether it does or not, a question we do not decide, it is apparent that this prohibition was inserted in the Act for the purpose of protecting vested rights, and has

no relation to the power or authority of the supervisor of buildings to recall permits which he conceives were erroneously, inadvertently, or wrongfully issued. Having held that the supervisor of buildings had authority to recall this permit, and that the status of complainant was in no wise affected thereby, we conclude, as did the chancellor, that Ordinance No. 1257 is valid, and that complainant is subject to its provisions.

"In many instances residential property owners could derive much larger incomes if they were permitted to devote same to commercial purposes. The right, however, to restrict such areas has become the law in this and practically every jurisdiction in the United States. While such regulations frequently result in financial loss to property owners, they are based upon the idea that 'the interests of the individual are subordinate to the public good.' Des Moines v. Manhattan Oil Company, supra, (193 Iowa 1096, 184 N. W. 823, [188 N. W. 921,] 23 A. L. R. 1322). It is not our province to pass upon the wisdom of such laws; that is the prerogative of the Legislature.

"For the reasons stated, the decree of the chancellor is affirmed."

There are two reasons why the language quoted above does not entitle the appellants to a reversal:

■ (1) The written application for the permit signed by appellants, (Exhibit 7) by its language precludes the appellants from claiming any right to use the premises in violation of the Zoning Ordinance. From said written application we quote the following two paragraphs:

"It is understood that any permit issued on this application *will not grant any right or privilege to erect any structure or to use the premises herein described for any purpose that is prohibited by the zoning regulations.*

*"All provisions of the ordinance and resolutions governing the use of property* and the height, area and bulk of buildings *will be complied with whether herein specified or not except any variation ordered by the Shelby County Board of Adjustment."* (Italics ours.)

We think that this language is clear and unambiguous and in explicit terms conclusively precludes the appellants from relying upon the permit issued pursuant to said application as authority to use the premises in violation of the Zoning Ordinance.

■ (2) Section 14 of the Zoning Ordinance provides for the establishment of a Board of Adjustment and the last paragraph of said section is as follows:

"The Board created by these regulations shall be known as the Shelby County Board of Adjustment, and shall have the power to make all rules for the conduct of its business, for the hearing, determination, and disposition of appeals and applications for variations of the provisions of these regulations made to it, not inconsistent with the Provisions of the Private Acts of 1931, or the regulations for the conduct of such Board herein created, or which may be hereafter passed by joint, concurrent or separate action of the Quarterly County Court of Shelby County and the Board of Commissioners of the City of Memphis, pursuant to the powers vested in them

or either of them by said Chapter 613 of the Private Acts of 1931.''

Section 20 of the Zoning Ordinance gives the Board of Adjustment the exclusive right to waive or modify any of the Zoning Regulations. Said section is as follows:

''Enforcement—It shall be the duty of the County Building Commissioner to see that these regulations are enforced through the proper legal channels. Appeals from the decision of the County Building Commissioner may be made to the County Board of Adjustment as provided by Section 11.

''Whenever, by any of the terms or provisions of these regulations, the power is given to waive or modify any of the regulations, conditions or provisions hereof, said power so to waive or modify shall be exercised exclusively by the County Board of Adjustment, unless it is otherwise specifically provided.''

Thus it clearly appears that the County Building Commissioner was authorized to issue permits only for the erection of buildings and the uses of property which were permitted by the Zoning Ordinance and that the variations and modifications of the provisions of the Zoning Ordinance could be authorized only by the Board of Adjustment. Therefore, the insistence that the appellants received a vested right under the building permit is respectfully overruled.

Appellants also insist that in so far as the Zoning Ordinance undertakes to prohibit, rather than regulate, the use by the defendant, Shankman, of his land for the excavation of gravel that said Ordinance is unreasonable and void and in violation of the Constitution of the

State of Tennessee and the Constitution of the United States. This same argument was made against other zoning regulations enacted by the City of Memphis in the case of Spencer-Sturla Co. v. City of Memphis, 1926, 155 Tenn. 70, 290 S. W. 608. In that case in the opinion of Judge Swiggart at page 78 of 155 Tenn., at page 610 of 290 S. W. it is stated: "It is difficult to perceive how the use of the land included within a district may be regulated without provisions excluding certain uses for specified purposes. We think a provision that the land within a specified district of a city may be used only for residence purposes, or for limited commercial or industrial purposes, is a regulation of the use of the land within the district and not a prohibition of its use. Palmer v. Express Co., 129 Tenn. 116, 157, 165 S. W. 236; Mayor, etc., of Nashville v. Linck, 12 Lea (80 Tenn.) 499."

In that case our Tennessee Supreme Court recognized, in substance, that zoning ordinances do, in effect, take private property for public use without just compensation therefor, but held that such ordinances are found legitimate under the exercise of the general police power of the state. From said opinion we quote further beginning at page 83 of 155 Tenn., at page 612 of 290 S. W. as follows:

"Upon the foregoing authorities it may be said safely that the Legislature may impose any limitation upon the use of property which it may deem necessary or expedient to promote and protect the safety, health, morals, comfort, and welfare of the people, provided only that this power shall not be exercised arbitrarily; that is, without reasonable connection or relation between the limitation imposed and the public safety, health, or welfare, etc.

"To determine whether a stated exercise of the police power is reasonable or arbitrary is a judicial function, and it is the determination of this question which the plaintiff in error is invoking by his assignments of error. The extent of judicial inquiry is, however, not unlimited.

"In Motlow v. State, 125 Tenn. 547, 589-590, 145 S. W. 177, (L. R. A. 1916F, 177), this court, through Chief Justice Neil, said:

" 'The police power is a necessary one, inhering in every sovereignty, for the preservation of the public safety, the public health, and the public morals. It is of vast and undefined extent, expanding and enlarging in the multiplicity of its activities as exigencies demanding its service arise in the development of our complex civilization. It is a function of government solely within the domain of the Legislature to declare when this power shall be brought into operation, for the protection or advancement of the public welfare. It is said that the courts have the right to determine whether such law is reasonable. By this expression, however, it is not meant that they have power to pass upon the act with a view to determining whether it was dictated by a wise or a foolish policy, or whether it will ultimately redound to the public good, or whether it is contrary to natural justice and equity. These are considerations solely for the Legislature. In determining whether such act is reasonable, the courts decide merely whether it has any real tendency to carry into effect the purposes designed—that is, the protection of the public safety, the public health, or the public morals—and whether that is really the end had in view, and whether the

interests of the public generally, as distinguished from those of a particular class, require such interference, and whether the act in question violates any provision of the state or federal Constitution.' ''

In the Spencer-Sturla case the court refers with approval to the case of Village of Euclid, Ohio v. Ambler Realty Co., 1926, 272 U.S. 365, 47 S. Ct. 114, 118, 71 L. Ed. 303. From said opinion of the United States Supreme Court we quote as follows:

"Building zone laws are of modern origin. They began in this country about 25 years ago. Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformily sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing

world it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the meaning, but to the application of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall.

"The ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities. In solving doubts, the maxim 'sic utere tuo ut alienum non laedas,' which lies at the foundation of so much of the common law of nuisances, ordinarily will furnish a fairly helpful clew. And the law of nuisances, likewise, may be consulted, not for the purpose of controlling, but for the helpful aid of its analogies in the process of ascertaining the scope of, the power. Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality. Sturgis v. Bridgeman, L. R. 11 Ch. 852, 865. A nuisance may be merely a right thing in the wrong place, like a pig

in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. Radice v. New York, 264 U. S. 292, 294, 44 S. Ct. 325, 68 L. Ed. 690.''

See also the interesting annotation in 168 A. L. R. 1188 entitled ''Validity of prohibition or regulation of removal or exploitation of oil, minerals, soil, or other natural products within municipal limits.'' In the principal case, Town of Burlington v. Dunn et al., May 7, 1945, 318 Mass. 216, 61 N. E. (2d) 243, 168 A. L. R. 1181, the Supreme Court of Massachusetts upheld the validity of a zoning ordinance of a small residential town prohibiting the stripping and removal of top soil or loam from two vacant lots as a valid regulation of the use of property in the public interest and therefore was held not to be an unreasonable and arbitrary interference with the rights of private ownership of property.

Hence, we find that His Honor the Chancellor was eminently correct in holding that the Five Mile County-City Zoning Ordinance in question bears a substantial relation to the public health, safety, morals and general welfare of the community in which said property is located. Appellants' assignment of error in both aspects is therefore respectfully overruled.

In addition, the record reveals in this case that the defendant, Joe Shankman, purchased the real estate in question after the enactment of the Zoning Ordinance and therefore, we hold that he purchased said real estate subject to the limitations and restrictions upon the use thereof as provided by the Zoning Ordinance.

It appears, however, that the appellants are not entirely without further recourse.

After the trial in the court below the attention of the Chancellor was called to the fact that the Five Mile City and County Zoning Ordinance had been amended sometime in November, 1958, prior to the trial and that said amendment pertained, among other things, to the extraction of sand and gravel.

We quote the salient portions of said amendment as follows:

"Now, Therefore, Be It Ordained By the Board of Commissioners of the City of Memphis and Resolved and Ordered by the Quarterly County Court of Shelby County:

"Section 1. That the Joint Ordinance and Resolution, the caption of which is set out in the caption hereof, passed on third and final reading by the Board of Commissioners of the City of Memphis on November 7, 1933, and adopted by Resolution of the Quarterly County Court on October 16, 1933, as amended be and the same is hereby amended as follows:

"A. By the addition of the following additional Use Regulations:

"Additional Use Regulations

"A. The Quarterly Court of the County of Shelby may by special permit and subject to such protective restrictions that are deemed necessary, authorize the location, extension, or structural alteration of any of the following buildings or uses, or an increase

in their heights, in any district from which these are prohibited or limited by this Resolution.

\*　\*　\*　\*　\*　\*　\*　\*

"11. Extraction of sand, gravel, topsoil, and other natural resources.

\*　\*　\*　\*　\*　\*　\*　\*

"B. Before issuance of any special permit for any of the above buildings or uses, the following conditions shall be complied with:

"1. A public hearing in relation thereto shall be held before the City-County Planning Commission; notice and publication of which hearing shall conform to the procedure prescribed in said Resolution and Ordinance for hearings on changes and amendments.

"2. The City-County Planning Commission shall study and report their recommendations to the Quarterly Court of the County of Shelby regarding the effect of such proposed building or use upon the character of the neighborhood and upon traffic conditions, public utility facilities and other matters pertaining to the public safety or general welfare. No action shall be taken upon any applications for a proposed building or use above referred to until and unless the report and recommendations of the City-County Planning Commission have been filed and reviewed by the Quarterly Court, but such report shall be made within thirty (30) days after the date of the public hearing."

The Chancellor had already determined that the appellants had no right to remove sand and gravel deposits

so long as the property was zoned agricultural and had ordered a permanent injunction to issue. After his attention was called to the amendment he provided that the decree would retain the cause in court "for the purpose of modification or dissolution by the court of the injunction order should it be made known to the court in a proper manner that any special permit has been properly issued for the extraction of gravel from the property of the defendant, Shankman."

It may well be that the appellants will be able to carry the burden of persuasion after proper application, public hearing, study by the City-County Planning Commission and ultimately obtain from the Quarterly County Court permission to vary the Zoning Ordinance so as to mine and extract the gravel. Until such time, however, the injunction of the Chancellor should remain in full force and effect.

A decree will be entered in this court affirming the decree of the Chancellor and remanding the cause to the Chancery Court for further proceedings consistent herewith. The costs of this appeal are taxed against the appellants and their surety.

Avery, P.J. (W. S.) and Bejach, J., concur.