Pittsburgh *v.* Elman Associates, Inc.

Argued May 2, 1972, before Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. President Judge BOWMAN did not participate.

2

*John R. Valaw,* Assistant City Solicitor, with him *Daniel M. Curtin,* Assistant City Solicitor, and *Ralph Lynch, Jr.,* City Solicitor, for appellant.

*Richard H. Martin,* with him *David W. Craig* and *Baskin, Boreman, Wilner, Sachs, Gondelman & Craig,* for appellee.

OPINION BY JUDGE KRAMER, June 12, 1972:

This is an appeal from an Order of the Court of Common Pleas of Allegheny County, dated October 4, 1971, dismissing exceptions of both parties and affirming a Decree Nisi, wherein injunctive relief sought by the City of Pittsburgh (City) was denied, and Elman Associates, Inc. (Elman), was permitted to complete the construction of a building known as Mount Royal Towers, pursuant to a permit issued by the City on June 9, 1970.

The Elman realty was rezoned by the City to an "RP Planned Residential Unit Development District," and thereafter, on April 9, 1970, Elman made application for the construction of an apartment building on

its property.[1]  The application disclosed a proposal to construct an eleven story building, one hundred four feet in height, containing ninety-seven "suites" together with one hundred twenty-two parking stalls.  Elman has a mortgage commitment of $1,800,000 for the project.  The application was approved by the Planning Commission of the City on June 5, 1970, and its minutes read, *inter alia,* as follows:

"4.  *'RP' Application No. 23, Mount Royal Towers*—Final Grading and Development Plan, 14th Ward.

"*Improvement Subdivision Site Plan, Elman Plan of Lots,* Forward Avenue, 14th Ward. . . .

"*Motion I*: That the Final Grading and Development Plan for 'RP' No. 23, Mount Royal Towers, Elman Associates, Inc., developer, drawing No. A-1 of 13, dated April 8, 1970, Tasso Katselas, Architect, BE APPROVED *on condition* that the plan be modified to show the lower parking level deck not less than 10 feet from Forward Avenue.  This may mean some rearrangement of parking stalls." (Emphasis added)

"*Motion II*: That the Improvement Subdivision Site Plan, Elman Plan of Lots, Forward Avenue, 14th Ward, City of Pittsburgh, County of Allegheny, Penn-

---

[1] A general verbal description of the construction site may be helpful.  The Elman property is a very irregular shaped lot, all of which may be described as a steep hillside.  The shape of the lot is somewhat like a laterally bent shovel, with the entrance road and some parking along the handle, and the building on the blade of the shovel.  The top of the property is within 20 feet of a cul-de-sac at the end of Mount Royal Road, which road continues an upward grade away from the cul-de-sac.  At the bottom of this hillside lot is Forward Avenue, about 175 feet (in elevation) below the top of the lot.  Forward Avenue at this site runs generally parallel to and along the limited access state highway known as Parkway East just east of the Squirrel Hill Tunnels.  At about the middle of the lot a shelf was carved into the hill, upon which the foundation was built.

sylvania, made for Marvin G. Elman by Bierworth, Mc-Combs, Barton Associates, Consulting Engineers, dated April, 1970, BE APPROVED, and the signatures of the proper officers of the Commission be affixed thereto (no street improvement needed and no monuments involved) because:

"(1)  The combination of plans above (modified as recommended) together form a complete final submission for a planned unit development in accord with Zoning Ordinance and Planning Commission requirements."

Pursuant to the application and its approval by the City Planning Commission, a building permit was issued to Elman by the City Zoning Administrator on June 9, 1970. The minutes of the Planning Commission meeting, at which the application was approved, indicate that a property owner, one Norman Marcus (Marcus), appeared at the Commission meeting to express his concern that the height of the proposed apartment building might block the view from Marcus' residence, which is situate on two lots adjoining the cul-de-sac on Mount Royal Road. The record also indicates that the architect for Elman, one Tasso Katselas, stated at the Planning Commission meeting that: "The top penthouse level would be no higher than ground level of the 'R1' homes to the north on Mount Royal Road." (R-301a)  One of the members of the Planning Commission testified, before the Court below, it was his *understanding* that the height of the subject building would be no higher than the level of Mount Royal Road at a cul-de-sac adjoining the Marcus property. A reading of the approval action of the Planning Commission, noted above (June 5, 1970), indicates that the only condition which was specifically mentioned pertained to the parking provisions for automobiles. It is important to note that the record is devoid of any

written *specific condition* concerning the *relative height* of the subject building to a specific point on Mount Royal Road, the property of Marcus, the cul-de-sac or to any other specific reference point.

Under authority of the permit, Elman commenced construction of the building. On or about March 9, 1971, Marcus, visually observing that with the construction of the ninth floor of the subject building, the height of the building was about level with the cul-de-sac at the end of Mount Royal Road, orally complained to City officials that any further construction of this building would block his view of a public park on another hillside some distance (about one-fourth of a mile) away. Whereupon the Zoning Administrator conducted an investigation which generally verified the observation of Marcus. On March 10, 1971, the Zoning Administrator, pursuant to a directive of the Planning Commission notified the City's Acting Superintendent of the Bureau of Building Inspection (the City official charged with enforcing the City's Zoning Ordinance) that there appeared to be serious discrepancies between the approved site plan[2] and the physical facts concerning the height of the proposed building. The City's Acting Superintendent of the Bureau of Building In-

---

[2] The subject site plan is a vital piece of evidence to this case, and was marked and introduced in the Court below as Plaintiff's Exhibit No. 6. The City appellant in printing the record has erroneously reproduced this exhibit in that certain markings on the original are not shown, and certain markings shown are not on the original. Such a critical misrepresentation of the original evidence made our work more difficult and should not be looked upon with favor by any Court. It is interesting to note that the City's error in this record is of greater magnitude than the ambiguity with which it charges Elman. The difference is, this Court took the time to corroborate the representation, even though it was submitted as true and correct by a member of the bar, whereas the City officials did not check this same information before issuing the permit.

spection was asked to revoke the building permit. The building permit was never revoked by the City. Instead the Acting Superintendent of the Bureau of Building Inspection issued a letter, entitled "Work Stop Notice" in which Elman was ordered to halt all work beyond the then existing height of the building, until such time as Elman would appear before the City Planning Commission to satisfactorily explain the alleged discrepancies. On advice of counsel, Elman refused to stop work on the construction of a building which was, in the opinion of counsel, in complete compliance with the approval given by the Planning Commission.

The alleged discrepancy is found on the site plan which was part of Elman's approved application. On this site plan there is a drawing interposed with other drawings showing a vertical view, denominated as "SITE SECTION 1-1." SITE SECTION 1-1 indicates that the elevation at foundation ground level for the apartment structure is 971.33 feet. It shows an eleven story building 104.0 feet high. It indicates that the top elevation of the subject building would be at elevation height 1,075.33 feet. SITE SECTION 1-1 also shows an elevation figure for Mount Royal Road with the following delineation: "Mount Royal Rd. El 1070'±." It is obvious that the Planning Commission intended to approve the construction of an eleven story apartment building, which would be 104 feet high, with a top elevation of 1,075.33 feet, which is 5.33 feet higher than what the Commission believed to be the elevation of *some point* on Mount Royal Road. Nowhere in the application, or the minutes, or the site plan, or any of the drawings, or this record is there a description or explanation of what point is 1,070 feet± elevation referred to on Mount Royal Road. The record indicates that each of the parties involved and each of the City

officials who viewed SITE SECTION 1-1 had a different impression and conclusion as to which point on Mount Royal Road the 1,070 feet± elevation figure referred. The lower Court concluded as evidenced in its Finding No. 20: "The parties in fact reached an understanding prior to the issuance of the building permit that the proposed building to be known as Mt. Royal Towers would rise no higher than the level of Mt. Royal Road at the cul-de-sac and said understanding was a condition attached to the issuance of the permit." The explanation given by the employee of the architect who made the delineation in question was that the elevation figure of 1,070 feet, plus or minus, was at a point less than the mean or average elevation of the neighboring property owners on Mount Royal Road as shown on the site plan. In fact the cul-de-sac at its curb top on Mount Royal Road was at elevation 1,060.07 feet as shown on Plaintiff's Exhibit No. 1. That being the case, the top of the subject building was about 15 feet higher than the elevation at the cul-de-sac, and also 5.33 feet higher than some point on Mount Royal Road as indicated on SITE SECTION 1-1.

When Elman refused to comply with the Work Stop Notice, the City filed a Complaint in Equity seeking to enjoin Elman from continuing the construction and to direct Elman to appear before the proper administrative agencies to correct the discrepancies alleged to exist on the site plan. After hearing, the lower Court held that an *understanding* existed that the height of the building would be no higher than the cul-de-sac on Mount Royal Road and was therefore a proper and effective condition attaching to the issuance of the permit. The lower Court further held that although the permit was issued under a mistake of fact, the condition was intended "solely to preserve the view from particular adjoining properties" and was in violation

of constitutional rights in that such a regulation could not be justified under the City's police powers. The Court concluded that Elman could not be enjoined from completing the top three stories of the subject building.

The City has appealed asserting the position that although the relative height condition was not in writing or otherwise specifically provided for, it is an enforceable condition because, under the Ordinance, the Planning Commission was empowered to authorize Planned Residential Unit Development which would "afford reasonable protection for the permissible uses of immediately adjacent properties surrounding the site." The City also argues that the mistake of fact found by the Court below was caused by the fraud and misrepresentations of Elman in the site plans. Therefore, argues the City, Elman should not be permitted to take any advantage of such misrepresentation resulting in detriment to citizens of the City of Pittsburgh.

We first note that the Complaint of the City does not allege fraud or intentional misrepresentation. The Court below made no finding of any such fraud or intentional misrepresentation; and after a careful review of this entire record, we hold that there is insufficient substantial evidence to support any argument that there was any fraud or intentional misrepresentation on behalf of Elman or any of his agents, servants or employees.

The legal question we find most problematic arises from the conclusion of the Court below that certain understandings between Elman and members of the Planning Commission were capable of achieving the stature of a binding condition. Although we agree with the result of the Court below we do so for other reasons. We can find no cases on the subject of im-

plied conditions attaching to building permits in this Commonwealth, and neither the Court below nor the parties cite any.

We first note that there can be no question but that the City has the authority under its police powers and by legislation to regulate the height of buildings. The Act of March 31, 1927, P. L. 98, Section 1, 53 P.S. 25051 states: "For the purpose of promoting health, safety, morals or the general welfare of the community, cities of the second class are hereby empowered to regulate, restrict or determine, the height, number of stories and size of buildings and other structures . . . ." For a provision of a zoning ordinance or a regulation thereunder to be valid it must bear a reasonable relationship to the protection of the health, safety, morals or general welfare of the public. *See Best v. Zoning Board of Adjustment,* 393 Pa. 106, 112, 141 A. 2d 606, 610 (1958) and *Sun Oil Company v. Zoning Board of Adjustment,* 403 Pa. 409, 169 A. 2d 294 (1961). In reading the City's Ordinance applicable to an RP Planned Residential Unit Development District, we have no doubt that the permitted use intended by Elman could be made subject to conditions relating to the height of the building for the purpose of affording reasonable protection to the permissible uses of the immediately adjacent properties surrounding the site. Such conditions could be a valid exercise of the City's police powers.

Assuming for the moment that the City, through its agencies, had the power to restrict the height of the subject building to an elevation no higher than the cul-de-sac of Mount Royal Road,[3] we must now search the record to determine whether any such condition was effectively made binding upon Elman.

---

[3] As will be noted from a reading of this opinion, we do not reach a holding on whether this relative height condition comes within the police powers.

We agree with the City that all of the specifications and patent representations made in the application, site plan and other documents submitted by the applicant are an integral part of the approval and permit issued. However in this case the City contends that a condition attached which was not specified by City officials and is not patently clear from the record.

We have no question that if the record supported an allegation that the developer or any of his agents, servants or employees, intentionally misrepresented facts to any of the City agencies, or perpetrated a fraud, that the powers of an equity court could be invoked to correct any such unlawful result. As already stated, the record in this case does not support any allegation of fraud or intentional misrepresentation (remembering none was alleged in the Complaint).

It is understandable, with the great burdens placed upon the various zoning and planning agencies of a city the size of Pittsburgh, that City officials will accept on face value, statements, drawings, statistics and other vital information from licensed and duly certified architects, engineers and developers. It must also be recognized that with the vast amount of detailed drawings, specifications and other material submitted for a project, such as is involved in this case, the possibilities increase for human error somewhere in the application data. It is because of such possibility that we must hold such City employees as its engineers, architects and planners to a duty to investigate, check and verify as much of the submitted detail as may be necessary for the City to properly carry out its duties. This is especially true in a case, such as the instant one, wherein a specific detail, such as the elevation of a building above a desired elevation, is in question. This record is replete with testimony reflecting the concern of neighboring property owners about the height of

the Elman building. The record indicates that one of the City officials could have determined the actual elevation of the Mount Royal Road cul-de-sac within "two minutes." We are at a loss to understand the failure on the part of so many City experts to determine the exact elevation of the cul-de-sac, a fact so vital and readily available. Even a cursory investigation may have brought to light the ensuing problem. The Planning Commission was well aware of its power to state conditions, as is evidenced by the specific parking condition set forth in its approval. The failure on the part of the Planning Commission to specifically set forth a condition relative to the height of this building to the desired elevation point on Mount Royal Road remains a mystery. We are faced with the unalterable fact that nowhere in this entire record is there to be found any specific notation, notice, minute, or statement that the intended elevation above which this building was not to rise was the elevation of the cul-de-sac (i.e., other than the testimony of one member of the Planning Commission at the time of the trial of this case). We find no fault with the finding of the Court below that the understanding of the Planning Commissioner witness was the understanding of the Commission; however, there is no evidence in this record supportive of a finding that Elman or any of the City's other agents or employees understood or intended a relative height condition to be a part of the permit issued.

To permit a contested understanding, or an unwritten condition disclosed after a permit is issued, to become binding upon a developer, would wreak havoc on building developments in this Commonwealth. To legally recognize such unwritten conditions in the law of zoning is to open the courts to multitudes of suits. To permit vague understandings and unwritten conditions to cloud otherwise proper permits would deprive

every developer and builder in this Commonwealth of any security in the permits issued to him by municipalities. If a municipality has the power to issue a condition, it must do so in a manner clear to the world, complete in content and unambiguous. The record indicates there was an ambiguity in SITE SECTION 1-1 pertaining to the elevation applicable to Mount Royal Road. The record, however, does not support an argument that that ambiguity was intentionally created. Quite to the contrary (and perhaps the most damaging piece of evidence to the City's position is the fact that) the site plan finally approved by the Commission shows a specific disclosure by Elman and his architect, via contour lines, that the cul-de-sac is at an elevation of about 1060 feet.[4] This evidence indicates to us that Ellman did not furnish "erroneous and/or misleading" information as the City alleges. Granted that the two elevation figures (1060' and 1070') are inconsistent or ambiguous, they were patently disclosed on the site plan and the City must be charged with the knowledge of their existence. Since the elevations of a point so close to the cul-de-sac and the exact elevation of the top of the subject building are clearly shown on the site plan as about a 15 feet difference, the City must be held to have approved such a difference. As pointed out earlier "SITE SECTION 1-1" indicates a 5.33 feet elevation above some point on Mount Royal Road, but that point is not specifically identified. If a mistake was made, it was unilateral on the part of the City.

---

[4] The printed record shows "1060.10 Top Curb" as the elevation of the cul-de-sac, and shows four other elevations on Mount Royal Road, although the original Plaintiffs' Exhibit No. 1 shows "Curb 1060.07" and eight elevation figures up the grade of Mount Royal Road.

The record discloses that every witness for the City acknowledged that the subject building met every specification of the application, including the site plan. The building is eleven stories high. It is no more than 104 feet high; and its top elevation is no more than 1,075 feet. The City Inspecting Architect verified that the building is in full compliance. Every witness for the City, who was asked, testified that he had no knowledge of any possible discrepancy, or of any condition violation, concerning the relative height of this building to the cul-de-sac until after the complaint of Marcus was voiced. This would indicate that no City official had been put on notice by the Planning Commission that any such condition existed. The record discloses that City officials visited this construction site often, none of them giving the slightest indication of the violation of any elevation conditions.

This is not to say that an unintentional unilateral or bilateral mistake or misunderstanding cannot be corrected. The City has the power to revoke the permit for cause. Once a permit is revoked, if the parties cannot settle their differences, the courts are available to receive the facts and rule on the issues.

"A municipal permit issued illegally or in violation of the law, or under a mistake of fact, confers no vested right or privilege on the person to whom the permit has been issued and may be revoked notwithstanding that he may have acted upon the permit; any expenditures made in reliance upon such permit are made at his peril." *Vogt v. Port Vue Borough,* 170 Pa. Superior Ct. 526, 528, 85 A. 2d 688, 690 (1952). The Court in *Vogt, supra,* further held: "Where, as here, the law provides a statutory remedy or method of procedure, the directions of such statute or act must be strictly followed. . . ." 170 Pa. Superior Ct. at 529, 85 A. 2d at 690. In this case, for reasons which remain unex-

plained, the officials of the City did not revoke the permit. Instead the City issued a "Stop Work Notice," under which Elman was specifically permitted to continue work on floors below the then existing level. This notice cannot be said to be a revocation. There is no statutory or regulatory provision for such a notice. The record discloses that the Acting Superintendent, who sent the notice, testified: "We did not revoke the Building Permit." At the very most, such a "Stop Work Notice" puts the developer on notice that he proceeds with the construction at his peril. A revocation of the permit however is the legislatively available procedure under which the City may effectively stop the construction under the permit and is the means by which the City may obtain a judicial determination on any infraction, discrepancy, error, mistake, and even fraud and intentional misrepresentation, so as to correct errors made in the issuance of a permit. If the developer continues to build after a proper revocation, the City has recourse to a court of equity for injunctive relief.

We find neither statutory nor decisional authority for the proposition that understandings or implied conditions may be raised to the stature of a binding condition to a building permit issued. As a matter of fact by analogy we can find authority for the proposition that no branch or subdivision of government may interfere with a property owner's constitutional rights under the guise of the police powers without specific authority. Even the President of the United States in a national emergency may not always interfere with one's constitutional property rights without specific authority. See Youngstown Sheet & Tube Co., et al. v. Sawyer, 343 U.S. 579, 96 L. Ed. 1153 (1951).

Many times our Pennsylvania Supreme Court has said that zoning ordinances must be strictly construed

since they are in derogation of the common law. *See Lord Appeal,* 368 Pa. 121, 81 A. 2d 533 (1951) ; *Medinger Appeal,* 377 Pa. 217, 104 A. 2d 118 (1954) ; *Lukens v. Ridley Township Zoning Board,* 367 Pa. 608, 80 A. 2d 765 (1951) ; *Kline v. Harrisburg,* 362 Pa. 438, 68 A. 2d 182 (1949). The rules of strict statutory construction prevent this Court from allowing zoning authorities to indulge in and rely upon the imposition of vague and unwritten conditions upon building permits.

In summary then, we hold that in view of the fact that the record in this case does not establish (1) fraud, (2) intentional misrepresentation, (3) any specific condition, or (4) any condition or agreement patently clear in the application (including all plans and specifications), approvals or the permit, relating to a restrictive relative height of the subject structure to the cul-de-sac at the end of Mount Royal Road, there was no effective or binding condition on such relative height. In view of the fact that the City did not revoke the permit (thus provided as the remedy to test the legitimacy of the permit), coupled with the facts that the City inspection officials verified that the subject structure was in full compliance with the application, site plan and other applicable documents, the Court below properly refused to grant an injunction to the City.

In view of this holding then, that there was not an effective restrictive condition attaching to the subject permit, it is not necessary for us to discuss the other issues raised in this appeal, such as whether the City's alleged implied condition on relative height for the purpose of protecting the distant view of the adjoining property owners on Mount Royal Road was a reasonable and constitutional regulation under the police power granted to the City.

Affirmed.