Pittsburgh *v.* Oakhouse Associates, et al. (Two cases).

Argued November 1, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*John R. Valaw*, Assistant City Solicitor, with him *Daniel M. Curtin*, Assistant City Solicitor, and *Ralph Lynch, Jr.*, City Solicitor, for appellant.

*David W. Craig*, with him *Baskin, Boreman, Wilner, Sachs, Gondelman & Craig*, for appellee.

OPINION BY JUDGE MENCER, March 19, 1973:

Before 1969, the building site in this case, located at 5326 Pocusset Street, Pittsburgh, was zoned S, Special District, a classification governing hillside-type development. A portion of the same premises, between

the building site and the street, was zoned R-2 Two-Family Dwelling District, as it is now. At that time the site was owned by four tenants-in-common, Messrs. Kerschbaumer, Starr, Kilbaney, and Schroeder (hereinafter the prior developer group).

This prior developer group applied to Pittsburgh City Council in 1969 to change the S classification of the building site to a less restrictive R-3 Multiple-Family Dwelling District classification. It was strongly represented to City Council that 14 units of row houses or townhouses would be erected on the site.

The City Planning Commission recommended that the building site be rezoned from S to R-3 but specifically also recommended that the access area, between the site and the street, be left as R-2 so that "no intrusion of multple-family type housing occurs along the one and two-family type frontage on Pocusset Street." That approach had been proposed to the Commission by the City Planning Department.

City Council rezoned the building site from S to R-3 without attempting to attach any limitations or conditions or restrictive covenants to the ordinance amendment. City Council also left the access area R-2, as recommended.

Under R-3 zoning, an apartment building ("multiple-family dwelling"), with a maximum height of 2½ stories, is permitted outright, but a group of townhouses requires a subsequent conditional use permit for "unit group development."

The attorney for the prior developer group, in emphasizing that the group proposed to build only townhouses, offered to provide a recorded document in the nature of a restrictive covenant to placate objecting neighbors who opposed construction of the townhouses, but these neighbors declined to relinquish their opposition and no restrictive agreement was made.

After the rezoning, the prior developer group proceeded in 1969 and 1970 with plans for townhouses and obtained a conditional use permit. Evidently because of financial and other problems, they were later required to obtain a renewal of that permit because such permits expire after 6 months if material commencement of construction has not occurred. Such renewals are presented to the Planning Department and, we are informed, are invariably forwarded to City Council for routine approval.

Here, however, for disputed reasons, the prior developer group's application for renewal of the permit never got beyond the City Planning Department. Allegedly as a consequence of this, three-fourths (Messrs. Schroeder, Starr, and Kilbaney) of the prior developer group withdrew.

Thereafter, in March 1971, Oakhouse Associates (hereinafter Oakhouse), a limited partnership having 65 percent of its interests held by Mellon-Stuart Company and Donald C. Peters (neither of whom was involved in the previous ownership) and 35 percent of its interests held by Mr. Kerschbaumer and his wife, entered into an agreement of sale for the building site.

Oakhouse, on March 19, 1971, filed an application for an occupancy permit to erect a 28-unit apartment building on the property. The then Zoning Administrator, Edwin Forrest, approved the application for zoning on March 23, 1971, after specifically discussing the number of stories the proposed building would have (an issue much in dispute later).

The matter then went to the Acting Building Inspection Superintendent, Paul Imhoff, pursuant to an application for a building permit. That application contained a section entitled "Zoning Compliance" in which the city's zoning clerk had written that the proposed building would be two stories, with basement.

The "Zoning Compliance" information related to the zoning ordinance which defines "story" differently from the building code.[1]   The application had no place to state the number of stories under the building code. *Oakhouse also filed complete construction plans showing exactly what was to be built, including the proposed number of stories.*   On July 26, 1971, the Superintendent properly issued a building permit.

Following issuance of the building permit, in September, 1971, Oakhouse proceeded to purchase the property from the prior developer group for $83,577.81, entered into a binding construction contract in a total amount of $500,522.00, took out a construction mortgage in the amount of $582,200.00 to finance the construction, entered into binding agreements with subcontractors, and actually commenced construction of the apartment building.

After the work began and the physical reality of the construction could be seen, neighboring residents raised opposition to the apartment building, beginning in late September, 1971.   In October, 1971, the Acting Zoning Administrator, James Brown (Edwin Forrest having died), was informed that Oakhouse's building might possibly exceed story and height maximums under the zoning ordinance.   After further investigation, Brown, on October 13, 1971, notified the Acting Building Inspection Superintendent that Oakhouse's con-

---

[1] Under the Building Code, §401, a basement *is* a "story": "Basement—A story partly below ground of which one-half (½) or more of the height is above the average level of the adjoining ground."

Under the Zoning Ordinance, §202, a basement *is not* a "story": "Basement—A portion of a building partly below ground and having more than one-half (½) of its height above the level of the adjoining ground." "Story—That portion of a building included between the surface of any floor and the surface of the next floor above it, or if there be no floor above it then the space between such floor and the ceiling next above it, not including cellar or basement."

struction evidently was in violation of the zoning classification for the site, and that, therefore, the former approval for zoning compliance was in doubt. Brown then suggested that Imhoff "take the proper steps to have the [building] permit revoked or amended to satisfy the zoning approval." Accordingly, by letter dated October 14, 1971, Imhoff notified Oakhouse that "[a]pparently there was an error between the applications and construction plans filed," and that the building permit "is hereby *suspended* until such time as you clarify the difference in the zoning approval and the construction plans submitted." (Emphasis added.)[2] Oakhouse was not specifically ordered to cease construction pending compliance or resolution of the matter before the proper administrative agency. Despite this letter of "suspension," Oakhouse continued construction of the apartment building.

Subsequently, the City brought an equity action seeking to enjoin further construction. The City asserted, *inter alia,* equitable estoppel because of alleged deceitful representations by the prior developer group, which brought about the zoning change, and further asserted that the building permit was granted through mistake of fact induced by the false representations of Oakhouse as to the number of stories and height of the proposed building. The Allegheny County Court of Common Pleas, by Judge WEIR, denied the injunction, preliminarily and finally, basically for the reason that the City had come into equity with unclean hands (because of the alleged obstruction of the conditional use permit renewal application by the then Planning Director, Bruce Campbell).

A few days after the Court denied the preliminary injunction on December 9, 1971, Building Inspection

---

[2] *See* note 3 *infra.*

Superintendent Imhoff, by letter dated December 16, 1971, revoked the building permit for violation of Section 223 of the building code.[3]  Oakhouse appealed this action of the Superintendent to the Board of Standards and Appeals (hereinafter Board).

Later, on January 20, 1972, the Board granted Oakhouse permission, in the form of a variance, to use the lower two levels of the proposed building as basement apartments.  The Board, however, by a two-to-one vote, upheld the revocation of the Superintendent.  But, a few days thereafter, the board member who had voted with the Superintendent (who had voted in his own favor despite a motion that he disqualify himself), by letter dated January 28, 1972, informed the Superintendent that he would vote to reinstate the building permit if the matter were reheard.

Thereupon, with the swing member of the board proposing to vote for Oakhouse upon a rehearing, the Mayor of the City of Pittsburgh, when informed of the one board member's change of mind, opposed a further hearing and promptly removed all the members of the Board, except the Superintendent, from office, leaving that key independent board without any membership which could act.

---

[3] Section 223 reads in pertinent part: "Whenever the work for which a permit has been issued is not being performed in conformity with the plans, specifications and descriptions filed with the application and upon which permit has been issued . . . it shall be the duty of the Superintendent to notify the applicant . . . that the work is being constructed in violation of this Code, and that such work must be *suspended* until permission has been obtained for such deviation, until the work is made to conform to the application, plans, specifications or statement upon which the permit was issued. . . . If the person, firm or corporation carrying out the work fails to comply with the said notice, it shall be the further duty of the Superintendent to *revoke* said permit. . . ." (Emphasis added.)

Oakhouse therefore appealed to the Court of Common Pleas of Allegheny County. That court, by Judge LENCHER, found that the apartment building was properly a two-story building under the zoning ordinance, properly a four-story building under the building code, and in compliance with law in every other respect. The building permit was held valid, and the variance granted to permit "basement" apartments was upheld.

Then, despite the court decisions, and before any appeal or supersedeas request was filed, the Superintendent resorted to blocking access to the site with city automobiles, until he was restrained by order of the Common Pleas Court issued May 1, 1972, by Judge SILVESTRI and continued by Judge DOYLE.

These appeals were taken by the City (1) from the denial of injunctive relief, and (2) from the approval of the building permit's validity and the variance's granting. On June 9, 1972, we denied appellants' petition for a supersedeas at No. 488 C.D. 1972.

## 488 C.D. 1972

The similarities between *Pittsburgh v. Elman Associates, Inc.*, 6 Pa. Commonwealth Ct. 1, 291 A. 2d 813 (1972), and the instant appeals are indeed striking. Elman Associates (Elman) first obtained a rezoning of property to permit an eleven-story apartment building. Then, after Elman laid complete construction plans before the proper City authorities, its plans were given zoning approval and a building permit was issued. Under authority of the permit, and in reliance thereon, Elman commenced construction of the building. On March 10, 1971, the City's Zoning Administrator (then Edwin Forrest) notified Acting Building Inspection Superintendent Imhoff that there appeared to be serious discrepancies between the approved site plan and the physical facts concerning the height of the proposed

building. Imhoff was asked to revoke the building permit. Quoting from the *Elman Associates* case itself, "The Court in Vogt [v. Port Vue Borough, 170 Pa. Superior Ct. 526, 529, 85 A. 2d 688, 690 (1952)] ... held: 'Where, as here, the law provides a statutory remedy or method of procedure, the directions of such statute or act must be strictly followed. ...' ... In this case, for reasons which remain unexplained, the officials of the City did not revoke the [building] permit. Instead the City issued a 'Stop Work Notice,' .... [On advice of counsel, Elman refused to stop work on the construction of a building which was, in the opinion of counsel, in complete compliance with the approval given.] This notice cannot be said to be a revocation. There is no statutory or regulatory provision for such a notice. ... At the very most, such a 'Stop Work Notice' puts the developer on notice that he proceeds with the construction at his peril. A revocation of the permit however is the legislatively available procedure under which the City may effectively stop the construction under the permit and is the means by which the City may obtain a judicial determination on any infraction, discrepancy, error, mistake, and even fraud and intentional misrepresentation, so as to correct errors made in the issuance of a permit. *If the developer continues to build after a proper revocation, the City has recourse to a court of equity for injunctive relief.*" 6 Pa. Commonwealth Ct. at 13-14, 291 A. 2d at 820-21. (Emphasis added.)

We can only conclude that the October 14, 1971, letter from Paul Imhoff to Oakhouse was similar to the "Stop Work Notice" in *Elman Associates*. Here, however, in accordance with Section 223 of the building code, the City properly sent a letter of suspension to Oakhouse but then instituted an action in equity for injunctive relief before taking the next legislatively pre-

scribed step of revoking the building permit.[4]  There-
fore, the preliminary and final injunctions were prop-
erly denied because injunctive relief was sought prema-
turely.

## 574 C.D. 1972

As above stated, the lower court upheld the validity
of the building permit and the variance permitting
"basement" apartments because the apartment building
was properly a two-story building under the zoning or-
dinance (assuming the lower two levels are basements),
properly a four-story building under the building code,
and in compliance with law in every other respect. We
agree.

It must be initially observed, after a careful review
of this entire record, that there is insufficient substan-
tial evidence to support any argument that there was
any fraud or intentional misrepresentation by either
the prior developer group or by Oakhouse. It would
seem that the prior group firmly intended to build row
houses or townhouses and that such a project was physi-
cally and, at least initially, financially feasible. The
change of ownership, without substantial evidence to
the contrary, was without sham or artifice.

The clearest and most important fact is that the new
ownership, Oakhouse, over a period of four months be-
tween March and July, 1971, fully disclosed its plans
for the proposed apartment building to the city offi-
cials. Those officials, including the late Zoning Ad-
ministrator, Edwin Forrest, purportedly the most
knowledgeable of all with respect to interpreting and
applying the zoning ordinance, reviewed the zoning ap-

---

[4] We note that when Superintendent Imhoff properly *revoked*
Oakhouse's building permit on December 16, 1971, Oakhouse proper-
ly responded by appealing to the Board of Standards and Appeals,
as above described.

plication and approved it. The Acting Building Inspection Superintendent examined the detailed construction plans and approved them. The number of levels proposed in the building and its proposed height were apparent on the face of the plans. The building permit was therefore issued to Oakhouse which, in reliance thereon, finally purchased the land (having been only equitable owner previously), made construction contract commitments, and commenced construction.

To acquire a vested right in a permit in Pennsylvania, a permittee generally must apply in good faith for a permit, obtain a permit valid under the existing zoning law, and expend substantial money or incur substantial liabilities in good faith reliance upon the permit. *Penn Twp. v. Yecko Bros.*, 420 Pa. 386, 217 A. 2d 171 (1966); *Herskovits v. Irwin*, 299 Pa. 155, 149 A. 195 (1930); *see also Gallagher v. Building Inspector, City of Erie*, 432 Pa. 301, 247 A. 2d 572 (1968); Comment, *Building Permits—Vested Rights Thereunder in Pennsylvania—A New Rule*, 73 Dick. L. Rev. 578 (1969).

Conversely, "[a] municipal permit *issued illegally or in violation of the law, or under a mistake of fact,* confers no vested right or privilege on the person to whom the permit has been issued and may be revoked notwithstanding that he may have acted upon the permit; any expenditures made in reliance upon such permit are made at his peril." *Vogt v. Port Vue Borough, supra,* 170 Pa. Superior Ct. at 528, 85 A. 2d at 690. (Emphasis added.)

"It is understandable, with the great burdens placed upon the various zoning and planning agencies of a city the size of Pittsburgh, that City officials will accept on face value, statements, drawings, statistics, and other vital information from licensed and duly certified architects, engineers and developers. It must

also be recognized that with the vast amount of detailed drawings, specifications and other material submitted for a project, such as is involved in this case, the possibilities increase for human error somewhere in the application·data. *It is because of such possibility that we must hold such City employees as its engineers, architects and planners to a duty to investigate, check and verify as much of the submitted detail as may be necessary for the City to properly carry out its duties.*" *Pittsburgh v. Elman Associates, Inc., supra,* 6 Pa. Commonwealth Ct. at 10, 291 A. 2d at 819. (Emphasis added.)

We conclude that those City employees here ably fulfilled that duty and that no illegality or mistake of fact admitted impediments to the original marriage of their true minds.

Affirmed.