Commonwealth of Pennsylvania, Department of Environmental Resources, Appellant, *v.* James L. Flynn, Appellee.

Argued June 4, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*John P. Krill, Jr.,* Assistant Attorney General, with him *Dennis J. Harnish,* Assistant Attorney General, for appellant.

*Jeffrey H. Gribb,* with him *Leonard Tintner,* for appellee.

OPINION BY JUDGE BLATT, September 24, 1975:

On December 31, 1973, James L. Flynn entered into an agreement of sale for the purchase of a 2.15 acre lot located adjacent to Clarks Creek in Middle Paxton Township (Township). Mr. Flynn intended to build a home for himself there and recognized that, because there was no public sewer system in the vicinity, a sewer permit for the installation of an on-site sewage disposal system would have to be obtained. He also realized that the issuance of such a permit was not a certainty by any means, and so he made sure that his obligation to purchase the property under the agreement was contingent upon his obtaining the necessary permit. Shortly after entering into the agreement, Flynn contacted Lester H. Bitner, the Township official responsible for issuing sewage disposal system permits, and asked Bitner what procedures he would have to follow in order to acquire such a permit. Bitner advised him that soil and percolation tests would have to be conducted on the lot and recommended Earl Kunkle, a soil scientist, as the best man in the area to conduct those tests. Flynn consequently engaged Kunkle's services and on January 7, 1974 Bitner accompanied Kunkle to the lot in question and watched Kunkle as he measured the depth of the water level beneath the surface at the location on the lot best suited for the system. Kunkle used a hand auger which penetrated to a depth of about four feet and which indicated that there was no water to that depth. On the basis of this test and other information supplied by Kunkle, Bitner issued a permit on January 11. On the permit form he

recorded the depth to seasonal high water table as eight feet, although he admitted in later testimony that he had no actual way of knowing the conditions below four feet. Upon presenting his sewer permit to the appropriate Township official, Flynn was issued a building permit. He then purchased the lot on February 4 and began construction of his home in April.

On May 10 several representatives of the Department of Environmental Resources (DER) visited Flynn's lot and conducted tests on soil located in a ditch which Flynn had dug for the purpose of draining surface water. These tests indicated that the seasonal high water table was above the depth required by DER regulations. On May 13, therefore, the DER wrote to the Township requesting it to revoke the permit, and on May 24 the DER ordered Flynn to refrain from installing an on-site sewage disposal system until he should receive written approval from the DER for such installation. By that time 75% of Flynn's home had already been constructed, and he has estimated that his incurred costs on the house up to that date were about $50,000.

The DER representatives returned to the lot on June 3 with Bitner and Kunkle. A six-foot deep backhoe pit was excavated at that time and the tests conducted therein again indicated that the DER regulations would be violated. This pit, however, was not located at the site which had originally been approved in the permit, and so the DER representatives returned for a third visit on July 18 and tested the soil at the proper site. They then again determined that a sewer system there would violate DER regulations. Meanwhile, Flynn had appealed the DER order to the Environmental Hearing Board (EHB), and a hearing was held before an examiner on August 21. The EHB reversed the DER order on October 31 and the DER has now appealed to this Court.

The Township's authority to issue a sewer permit in this case was derived from Sections 7 and 8 of the Sewage

Facilities Act[1] as that Act existed on the date of the permit issuance.[2] At that time the Act required individuals to obtain a permit from the municipality before constructing a sewage disposal system, and the municipality was required to conform to the statewide standards and regulations adopted by the DER. At 25 Pa. Code §73.11(c) there is found the following regulation which Flynn's plans would apparently violate: "The maximum elevation of the seasonal ground water table or perched water table, as determined by direct observation of the water table by the presence of soil mottling[3] shall be at least four feet below the bottom of the aggregate to be used in the subsurface absorption area." (Footnote added.) Because the DER at 25 Pa. Code §73.71(b)(5) requires the trench bottom to be at a minimum depth of two feet, there must be at least six feet between the soil surface and the seasonal high water table. The tests conducted on July 18 at the approved site showed that mottling began at a depth of 51 inches and that, therefore, the site was unacceptable under the regulations.

In issuing its order, however, the DER invoked authority *not* under the Sewage Facilities Act but rather under Sections 5 and 402 of The Clean Streams Law.[4] Section 402(a) thereof provides:

"(a) Whenever the board[5] finds that any activity, *not otherwise requiring a permit under this act,* in-

---

1.  Act of January 24, 1966, P. L. 1535, *as amended.*

2.  The Act has subsequently been substantially revised.

3.  Mottling has been described as a condition of the soil similar to a ring in the bath left by departing water in a bathtub, which indicates the seasonal high water table.

4.  Act of June 22, 1937, P. L. 1987, *as amended,* 35 P. S. §§691.5 and 691.402.

5.  The duties of the Sanitary Water Board have subsequently been vested in the DER. See Section 1901-A(20) of the Act of April 9, 1929, P. L. 177, *as amended,* 71 P. S. §510-1(20).

cluding but not limited to the impounding, handling, storage, transportation, processing or disposing of materials or substances, creates a danger of pollution of the waters of the Commonwealth or that regulation of the activity is necessary to avoid such pollution, the board may, by rule or regulation, require that such activity be conducted only pursuant to a permit issued by the department or may otherwise establish the conditions under which such activity shall be conducted, or the board may issue an order to a person or municipality regulating a particular activity. Rules and regulations adopted by the board pursuant to this section shall give the persons or municipalities affected a reasonable period of time to apply for and obtain any permits required by such rules and regulations." (Emphasis and footnote added.)

Section 5(d)(3) authorizes the DER to "[i]ssue such orders as may be necessary to implement the provisions of this act or the rules and regulations of the board." We believe that these sections, in conferring broad powers upon the DER in the enforcement of The Clean Streams Law, should be construed as giving the DER the power to regulate an activity which requires a permit under *another* Act, provided that such activity "creates a danger of pollution of the waters of the Commonwealth or that regulation of the activity is necessary to avoid such pollution." The asserted danger here would result if the sewage from Flynn's system infiltrated Clarks Creek and consequently polluted a fish hatchery just downstream. The EHB, however, found that: "Although a fish hatchery is located downstream from the aforesaid lot there was insufficient evidence to prove that it would be affected by a septic system located on appellant's (Flynn's) lot." (Footnote omitted.) This finding was adequately supported by the testimony of Bitner who stated that he felt there would be no infiltration into the stream caused by Flynn's system. The EHB's well supported findings are,

of course, final, and because of those findings we seriously question whether or not the conditions under Section 402(a) were sufficiently present for the DER to invoke its powers under The Clean Streams Law, as it here attempted to do.

We believe, however, that there is a more fundamental reason why the DER's order cannot be upheld. In our view, Flynn has acquired a vested right to use the sewage and building permits which he obtained from the Township.

We must first point out the general rule that a municipal permit issued illegally or in violation of the law, or under a mistake of fact, confers no vested right or privilege on the person to whom the permit has been issued and it may be revoked notwithstanding that he may have acted upon the permit; any expenditures made in reliance upon such permit are made at his peril. *Klavon v. Zoning Hearing Board of Marlborough Township,* 20 Pa. Commonwealth Ct. 22, 340 A.2d 631 (1975); *Pittsburgh v. Oakhouse Associates,* 8 Pa. Commonwealth Ct. 349, 301 A.2d 387 (1973); *Pittsburgh v. Elman Associates, Inc.,* 6 Pa. Commonwealth Ct. 1, 291 A.2d 813 (1972).; *Vogt v. Port Vue Borough,* 170 Pa. Superior Ct. 526, 85 A.2d 688 (1952). We believe, however, that an exception must be recognized under the facts of this case. The underlying principle which supports that general rule of law, as explained at 6 A.L.R. 2d 956 (1949) is that every person is presumed to know the extent of power of the municipal authorities. For instance, in *Hasage v. Philadelphia Zoning Board of Adjustment,* 415 Pa. 31, 202 A.2d 61 (1964) the landowners purchased property which was already being used in clear violation of the zoning ordinance. Although the ordinance had not been enforced as to that property for eleven years, the landowners thereby gained no right to use their property in the unlawful manner. A simple check of the zoning status of the property would have immediately revealed that the use was unlawful.

In the instant case, Flynn took every conceivable precaution to protect himself. He obtained the services of the best available local soil scientist at the suggestion of the Township sewage enforcement officer, and he permitted his soil to be tested under the observation of that officer. His downfall was in relying on the representations of the Township officer and the soil scientist to the effect that the tests indicated a seasonal high water table of eight feet. Even if Flynn had been aware of and understood the DER regulations, however, he still would have had no way of knowing that the auger method was not the most thorough method for determining whether or not those regulations were complied with and that a backhoe pit would have to be dug in order to determine conclusively whether or not there was compliance. It would, in our view, be overly harsh to hold Flynn to such knowledge. In *Pittsburgh v. Elman Associates, supra,* Judge KRAMER discussed the increasing responsibilities falling upon public employees in this day and age when so much highly technical data must be approved by them:

> "It must also be recognized that with the vast amount of detailed drawings, specifications and other material submitted for a project, such as is involved in this case, the possibilities increase for human error somewhere in the application data. It is because of such possibility that we must hold such City employees as its engineers, architects and planners to a duty to investigate, check and verify as much of the submitted detail as may be necessary for the City to properly carry out its duties." 6 Pa. Commonwealth Ct. at 10, 291 A.2d at 819.

We would also emphasize that Flynn obtained his permits and used them entirely in good faith. There is not the slightest bit of evidence to suggest that Flynn had any inkling that his sewer permit was improperly issued until he was informed of the DER letter to the Township at a time when his home was nearing com-

pletion. This element of good faith clearly distinguishes the instant case from cases such as *Valicenti's Appeal,* 298 Pa. 276, 148 A. 308 (1929) and *New Castle City v. Withers,* 291 Pa. 216, 139 A. 860 (1927) wherein landowners deliberately disregarded a law which, they claimed, a municipality was estopped to enforce. Here, Flynn obeyed the DER order when it was issued and did not install the septic system until after the DER order was reversed by the EHB. He delayed at great personal sacrifice, for he was without a permanent home until he could install the system and move into the home he had just constructed.

Another important factor here is the extent of reliance Flynn placed upon the permit, and we cannot disregard his large personal investment. This is not a situation similar to that in *Ventresca v. Exley,* 358 Pa. 98, 56 A.2d 210 (1948) where the landowner's expenses, incurred in reliance on an unlawful permit, were largely recoverable.

It is also important to point out that no appeal was taken from the issuance of the permit. While this in itself would not necessarily foreclose the DER from subsequent action, the failure of anyone to appeal that issuance is certainly another circumstance which would have indicated to Flynn that his permit was in order.

Ryan, in his scholarly work,[6] discusses the applicability of the vested right doctrine to situations where a municipality has erroneously issued a building permit. His conclusion at Section 8.3.2 seems to be that after the appeal period has expired and the owner has incurred significant non-recoverable costs in reliance on the permit, the owner's good faith reliance on the permit should afford him a vested right to complete the work, albeit the permit was issued in error. Support for such a doctrine is found by him in cases such as *Heidorn Appeal,*

---

6. R. S. Ryan, Pennsylvania Zoning Law and Practice (1970).

412 Pa. 570, 195 A.2d 349 (1963); *Sheedy v. Zoning Board of Adjustment*, 409 Pa. 655, 187 A.2d 907 (1963); *Moyerman v. Glanzberg*, 391 Pa. 387, 138 A.2d 681 (1958); and *Al Monzo Construction Company, Inc. v. Monroeville Borough*, 5 Pa. Commonwealth Ct. 97, 289 A.2d 496 (1972). We support this view.

Finally, we would re-emphasize the finding of the EHB that there was insufficient evidence to prove that the fish hatchery downstream would be adversely affected by Flynn's septic system. In the event that individual property rights or the public health, safety or welfare do, in the future become endangered, appropriate remedies may then be applied against Flynn. But so long as his use of the permit does not have that effect, he is entitled to exercise the rights afforded to him under it.

In summary, we conclude that the following five factors compel us to hold that Flynn has acquired a vested right in the permit even though it was issued on the basis of a mistake:

1) his due diligence in attempting to comply with the law;

2) his good faith throughout the proceedings;

3) the expenditure by him of substantial unrecoverable funds;

4) the expiration without appeal of the period during which an appeal could have been taken from the issuance of the permit;

5) the insufficiency of the evidence to prove that individual property rights or the public health, safety or welfare would be adversely affected by the use of the permit.

We, therefore, issue the following

ORDER

AND NOW this 24th day of September, 1975, the order of the Environmental Hearing Board is hereby affirmed.