## Appeal of Eastman Venture, II

*John P. Koopman,* for appellants.
*John W. Potkai,* for zoning hearing board.
*Leslie G. Dias,* for township.

RUFE, *J.,* September 23, 1980—On January 13, 1977 Bensalem Health Center, Inc. (Health Center) leased office space from Eastman Venture, II (Eastman) for use as a medical office. Eastman then expended $37,000 to ready the space for the medical office use, $16,000 of which is not recoverable in the event the medical office use is determined to be illegal.

On March 14, 1977 an application for a use and occupancy permit for the medical office was filed with the Bensalem Township Zoning Officer. The officer discussed the application with the township solicitor, including the possibility that the medical office might engage in performing abortions, and was informed by the solicitor that the township could not control the activities in the medical office. Thereafter, on April 26, 1977 the zoning officer issued the requested use and occupancy permit without restriction or limitation. That permit has never been revoked or invalidated.

For the next seven months the medical office operated without incident, staffed by a board certified obstetrician-gynecologist and a board qualified general surgeon, both of whom serve on the staffs of four hospitals. No challenge or appeal was ever filed to the issuance of the use and occupancy permit, no complaint was ever lodged with either Eastman or the Health Center, nor was any notice or warning of any impropriety or illegality in the operation of the medical office ever issued.

Nevertheless, at the urging of residents who objected to the fact that legal abortions were allegedly performed at the medical office, the Township, on November 23, 1977, issued a cease and desist order to Eastman directing the termination of the medical office, and on December 12, 1977 a similar cease and desist order was issued to the Health Center itself.

Both Eastman and the Health Center filed timely appeals to the Bensalem Township Zoning Hearing Board, and after four emotionally charged hearings, which included the receipt into evidence of 79 petitions containing over 1,500 signatures in opposition to the medical office, the board held that the permit for the medical office was properly issued. However, the board also held[1] that the actual operation of the medical office in offering direct service to the public rather than limiting its operation to serving only the other tenants in the 13 acre industrial park/office center as an accessory use to the complex exceeded the permit and was not in compliance with the zoning ordinance and accordingly upheld the cease and desist order. The board also held that Eastman and the Health Center failed to establish any vested rights in their issued permit for the medical office.

Eastman and the Health Center each filed separate appeals to the board's decision. The township also filed an appeal to the board's holding that the permit was properly issued.

Finally, the zoning hearing board failed to provide a transcript of the hearing and the transcript costs of $741.14 were paid by Eastman in order to supply

1. No such conclusion of law is actually set forth, but must be deduced from the discussion portion of the board's decision and order to justify the final order entered.

the court with the record. Eastman now seeks reimbursement of the transcript costs.

No new evidence has been received by this court and, accordingly, our review is limited to a determination of whether the board abused its discretion or committed an error of law: Buckingham Developers, Inc. v. Buckingham Township Zoning Hearing Board, 34 Bucks 85 (1980). The board entered only two conclusions of law as follows:

"1. Officers of the Township have not misinterpreted or misapplied any provision of a valid ordinance, to wit, Bensalem Township Zoning Ordinance Article X, §1101.

"2. Appellants have not established any vested right to continue an illegal use in the applicable zoning district."

Despite these two conclusions of law, i.e., that the permit was properly issued, and an apparently irrelevant conclusion that no vested right in an illegal use exists, the board nevertheless dismissed Eastman's and the Medical Center's appeals thereby allowing the cease and desist order to remain in effect.

The explanation for this apparently inconsistent result must be derived from the board's finding of fact that the Medical Center's clientele is derived mainly from the general public rather than the industrial workers employed in the industrial park[2], and the language set forth in the "discussion" portion of the decision as follows:

". . . it is evident from testimony that a discretionary effort by the acting zoning officer in issuing the permit for a nominally permitted use, a medical office, was not met by a good-faith effort to comply

---

2. Finding of Fact Number 7.

with the ordinance restrictions on public service, either at the initiation of the application, or the hearing by failure to provide records of service to persons connected with the general industrial site."

Thus, it would appear that the board, while holding that the use was permissible and the permit properly issued, also impliedly attached restrictions and limitations to the permit which were not set forth on the permit certificate itself to the effect that the medical center could only treat workers employed in the surrounding industrial park.

The subject property is located in an M-2 General Manufacturing District and the specific provisions of the Bensalem Township Zoning Ordinance in question are the following:

## ARTICLE X
## M-2 GENERAL MANUFACTURING DISTRICTS

"Section 1001. Use Regulations—A building may be erected or used, . . . for any of the following purposes and no other, provided that no use which shall create a noxious, offensive, or hazardous condition beyond the district boundary line shall be permitted.

"1. Any use permitted in M-1 Light Manufacturing Districts, except that . . . [exceptions delineating certain requirements for special exceptions and specifically prohibiting further dwelling uses]."

## ARTICLE IX
## M-1 LIGHT MANUFACTURING DISTRICTS

"Section 901. Use Regulations—A building may be erected or used, . . . for any of the following purposes and no other, provided that no use which shall

create a noxious, offensive or hazardous condition beyond the district boundary line shall be permitted:

"1. Any use permitted in HC Commercial Districts including RA dwelling use, except that:

· · ·

"b. Retail store or any other use which involves as a main use, direct service to the public is not permitted, unless it is in connection with, part of, and on the same premises as a permitted manufacturing use within the district."

All parties agree that a medical office is permitted in the M-2 zone as a result of this provision (subsection b) of the ordinance. However, the township focuses on the words "direct service to the public is not permitted" and argues that the medical office may serve only the manufacturing plants located in the same industrial park, and may not offer direct service to the public. Eastman and the Medical Center emphasized the word "unless" and that so long as the medical office "is in connection with, part of, and on the premises (i.e., the industrial park) as a permitted manufacturing use," it may offer direct service to the public. Obviously, the board adopted a middle ground position, seizing on the words "main use" and determined that presently more service is being presented to the public than to the industrial park workers, and accordingly the cease and desist order was proper.

We find that the zoning hearing board was quite correct in its holding that the permit was properly issued. However, the implied holding that the direct service to the public outweighs the service to the industrial park workers thereby rendering the use improper is fraught with legal problems. This interpretation requires a determination of the "main

use" of the property, balancing the public service against the industrial park related service, not only as to this medical office, but as to any other use that might qualify in the district. By what standard shall the "main use" determination be made?

For example, the testimony refers to a warehouse located in the industrial park which periodically conducted warehouse sales whereby merchandise was sold at retail directly to the public. Is the "main use" of warehouse versus retail sales determined by the amount of floor space devoted to each; the number of parking spaces or parking area allocated to each; the number of hours in the day when the sales occur; the number of days in the year when retail customers are permitted there; the dollar value of one use as opposed to the other; the number of employes necessary to conduct one operation compared to the other; the amount of traffic generated by each use; or perhaps some complicated combination of all these factors and some others we have not yet thought of? Is it also possible that the use may fluctuate between complying and not complying from year to year (or some other artificial time period) depending on the relative balancing of the factors during the time period? If the warehouse sales were so successful one year that management decided to devote 75 percent of its floor space, parking area, personnel, financial investment, and advertising budget to such use for 40 percent[3] of the working hours of the warehouse building the following year, would the use still comply with the ordinance under the board's interpretation? Merely to state the foregoing ques-

3. Does it make a difference if the percentage is 20 percent, 60 percent, 85 percent or some other number?

tions points out the difficulty, uncertainty and ambiguity created by the board's interpretation of this section of the ordinance in this case.

Indeed in the present case the board found as a fact industrial workers represented "a small percent of the clients at the center," and "that services were by appointment, not only during normal working hours, but also during evenings and Saturdays." In the discussion portion of the board's decision the board stated:

"Testimony presented by the Appellant revealed that the present use of the medical office is, in the main, by appointment with members of the general public; a negligible amount of service being presently offered to industrial workers, whether for occupational accident or health maintenance."[4]

One further clue to the board's approach to balancing one use against the other can be derived from the following sentences set forth in the discussion portion of the decision:

"Records of service to individual workers were requested of the appellants in an effort to assess the proportion of service to the public and to workers connected with permitted industrial use. However, such records were not provided at any of the hearings."

If such records had been supplied, how would they have been evaluated to "assess the proportion of service" to the two uses? Is the proportion determined by mere numbers of patients in each category, and if so, which category does an industrial

4. How many industrial workers' health insurance examinations are worth one treatment of a member of the general public's whiplash injury?

worker injured at home fall into? Or should the proportion be determined by the amount of time devoted to a patient in either category, the number of visits, the amount of fees paid to the health center for the service provided in each category, or any combination of these criteria as well as other measuring factors we may not have thought of? In addition, the board made no reference in its decision to the uncontroverted testimony that the Health Center had purchased extensive medical equipment (and would have bought more but for the cease and desist order) that would have related particularly to the treatment of industrial accidents. Nor did the board refer to the uncontroverted testimony that contacts had been made with various companies in the industrial park to treat their employes, and in fact, arrangements had been made with two companies, one with 400 employes and the other with 7500 employes, to treat their workers. Again, how do these factors fit into the equation?

It is clear from the foregoing examples that no standard or guidelines are provided in the ordinance to make the determination or evaluation the board suggests in its decision. The board's interpretation of the ordinance imposes an ambiguity and uncertainty that we do not believe should be read into the provision. (See Desousa v. Zoning Hearing Board of Whitehall Township, 19 Pa. Commonwealth Ct. 367, 369, 339 A. 2d 650, 652 (1975), for the proposition that ambiguities must be resolved in favor of the land user.) "Direct service to the public" is not permitted *unless* "it is in connection with, part of, or on the same premises" as a permitted use. "Unless" is the operative word. All parties agree that the Health Center as an industrial medi-

cal clinic and treatment center is clearly a permitted use. That use being a valid permitted use, "direct service to the public" without restriction or limitation is then clearly contemplated as being also permitted by the ordinance as a result of the modifying "unless."

Accordingly, we affirm the board's conclusion of law to the effect that the permit was properly and validly issued. Further, we would conclude that Eastman and the Health Center are not engaging in an illegal use of the premises, and we would therefore also affirm the board's conclusion of law to the effect that Eastman and the Health Center have not established any vested right in an *illegal* use. It is only the board's implied and unstated conclusion of law to the effect that Eastman and the Health Center have exceeded supposed, but unimposed, restrictions on their permit that we must reverse.

Because of the foregoing decision, it is not necessary for us to consider Eastman's and the Health Center's arguments that they have met the five step criteria to establish a vested right in their permit as outlined in Petrosky v. Zoning Hearing Board of the Township of Upper Chichester, 485 Pa. 501, 402 A. 2d 1385 (1979), and Com. v. Flynn, 21 Pa. Commonwealth Ct. 264, 344 A. 2d 720 (1975), except to state parenthetically that we agree that all five criteria have been met and a vested right in the permit has been established.

Finally, on the question of reimbursement of the transcript costs to appellant, Eastman, it is now clear that the municipality is responsible for the costs of the original transcript to be supplied to the court: In re: Appeal of Mark-Garner Associates, Inc., 50 Pa. Commonwealth Ct. 354, 413 A. 2d 1142

(1980). However, it is not clear from the record submitted whether the $741.14 advanced by Eastman was for the original transcript only or whether that amount also included a copy for Eastman. Clearly, the township is not responsible for the costs of Eastman's copy of the transcript. Accordingly, we will order that Eastman be reimbursed the amount advanced representing the actual cost of the original copy of the transcript submitted to the court.

### ORDER

And now, September 23, 1980, the order of the Bensalem Township Zoning Hearing Board denying the appeal of Eastman Venture, II and Bensalem Health Center, Inc. is hereby reversed and the cease and desist orders of November 23, 1977 and December 12, 1977 are hereby dissolved; the Township of Bensalem is ordered and directed to reimburse Eastman Venture, II the actual cost of the original copy of the transcript submitted to the court.