**FAR TOWER SITES, LLC**

v.

**KNOX COUNTY, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Dec. 11, 2002 Session.

July 30, 2003.

Opinion and Order on Rehearing Aug. 20, 2003.

Permission to Appeal Denied by Supreme Court Jan. 26, 2004.

Appeal from the Circuit Court for Knox County, No. 1–782–98; John F. Weaver, Chancellor.[1]

Mark Jendrek and W. Morris Kizer, Knoxville, Tennessee, for the appellant, Far Tower Sites, LLC.

Michael W. Moyers, Knox County Law Director, Knoxville, Tennessee, for the appellees, Knox County and the Tennessee Technology Corridor Development Authority.

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

## OPINION

Dial Call, Inc. ("Dial Call") entered into a sublease with Far Tower Sites, LLC ("Far Tower"), by the terms of which Dial Call sublet to Far Tower a 100 foot by 100 foot hilltop parcel of property in Knox County so Far Tower could construct a cellular telecommunications tower. Dial Call had previously obtained—and periodically renewed—a building permit from Knox County for the same purpose. After the sublease was executed, Far Tower secured a new building permit in its own name and was assured by the Knox County employee responsible for the issuance of such permits that Far Tower was "good to go, go build it." After expending monies and doing both on-site and off-site work in connection with the proposed tower, Far Tower ceased its construction efforts when Knox County issued a stop work order. The order was predicated upon Far Tower's failure to obtain a Certificate of Appropriateness ("COA")—a legal prerequisite to the issuance of a building permit—from the Tennessee Technology Corridor Development Authority ("the Authority") under a private act of the General Assembly named the Tennessee Technology Corridor Development Authority Act ("the Tech Act"). Far Tower's subsequent efforts to obtain a COA were ultimately unsuccessful and, as a consequence, it abandoned the project. Proceeding under a number of theories, Far Tower sued Knox County and the Authority for damages based upon an alleged taking of its property. Following a bench trial, the court below dismissed Far Tower's complaint and entered judgment in favor of the County and the Authority. Far Tower appeals, urging us to (1) reverse the trial court, (2) award it damages of $173,965.50 plus interest from the date of "taking," and (3) remand for a hearing on Far Tower's claim for attorney's fees. We affirm the trial court's judgment.

### I. Facts

There does not appear to be a sharp dispute between the two sides as to the facts underlying this litigation. This being the case, our recitation of those facts will borrow liberally from the statement of facts found in Far Tower's brief.[2] In or-

---

1. Far Tower's earlier-filed petition for writ of certiorari was pending before Chancellor Weaver when this circuit court action was filed and consolidated with the chancery court matter. When the certiorari petition was voluntarily dismissed, Chancellor Weaver agreed to hear the circuit court case.

2. The joint brief filed by the County and the Authority does not contain a statement of the facts.

der to put the issues before us in proper context, we have elected to extensively recite those facts.

On May 10, 1995, Dial Call leased a parcel of real property located near Carmichael Road in Knox County ("the Tower Site") from James C. Gammon for the purpose of constructing a cellular telecommunications tower ("the Tower"). The Tower Site, being 100 feet by 100 feet, was a wooded area at the top of a hill. The site was zoned "agricultural" and the erection of a cellular tower on the Tower Site as planned by Dial Call was expressly permitted by the Knox County Zoning Ordinance.

The rent specified in the lease between Gammon and Dial Call was $500 per month for the initial five-year term. The lease recited Dial Call's option to renew its lease for four additional five-year periods, with the rent for the option terms being increased by specified percentages. Because a tower site involves a substantial investment, it was Dial Call's expectation that it would exercise all of the four options to renew.

Dial Call applied to the Knox County Codes Office for the issuance of a permit ("the original Permit") for the construction of a cellular tower on the Tower Site. On June 23, 1995, the original Permit was issued. No representative of the Knox County Codes Office ever advised a representative of Dial Call that, prior to the issuance of a permit, Dial Call first had to obtain a COA from the Authority. Dial Call did not otherwise know that a COA was a prerequisite to the issuance of a permit.

The Authority is a public, governmental body acting as an agency and instrumentality of Knox County. It was created by the "Tennessee Technology Development Authority Act," Chapter 148, Private Acts of 1983. The Tech Act applies to a large area of property located in West Knox County, known as the Tennessee Technology Corridor ("the Corridor").

Within six months of the issuance of the original Permit, Dial Call built an access road across Mr. Gammon's property from Carmichael Road to the tree line where the Tower Site was located and did erosion control work. Some work occurred at the Tower Site at least every six months. Dial Call never allowed the original Permit to expire, renewing it from time to time at the office that had initially issued it. Whenever the original Permit was renewed, Dial Call dealt with Mr. Bill Pierce in the Knox County Codes Office. Mr. Pierce never advised Dial Call that it had to obtain a COA from the Authority in order to renew the original Permit.

On March 31, 1997, Dial Call and Far Tower entered into the sublease agreement, whereby Dial Call subleased the Tower Site to Far Tower. The length of the sublease and the options to renew contained therein were identical to those specified in the original lease between Mr. Gammon and Dial Call.

Under the terms of the Dial Call/Gammon lease, the consent of Mr. Gammon to a sublease was required. As a condition for granting his consent, Mr. Gammon insisted upon, and Dial Call agreed to, a modification of the original lease so as to provide for a new rental amount of $1,000 per month, subject to specified increases for each of the option terms.

The consideration for the sublease was Far Tower's agreement to construct a tower, at its sole cost, no later than January 1, 1998, on which Dial Call would be permitted to install, at no cost, its wireless communications equipment. Far Tower would not be required to pay rent to Dial Call; the latter would continue, however, to pay the ground rent to Mr. Gammon on the

original lease. The sublease further provided that, in the event the Tower was not substantially completed by January 1, 1998, Far Tower would be deemed to be in default, in which event, Dial Call could terminate the sublease and receive the sum of $5,000 from Far Tower as damages.

As previously indicated, the initial term of the sublease was five years, with four options to renew, each for five years. It was Far Tower's expectation that each of the options would be exercised because of the company's significant investment in the Tower and because it was confident of its ability to attract customers to locate on the Tower, thereby allowing it to reap substantial income.

In entering into the sublease agreement with Dial Call, Far Tower relied upon the fact that the original Permit had been issued. It would not have entered into the sublease had it known that there was a problem with the original Permit.

In 1997, Mr. Pierce was a Plans Examiner in the Administration Department of the Knox County Codes Office. His responsibilities included the reviewing of plans for various structures, including cellular towers. Mr. Pierce testified that he would review the plans and other documents submitted to Knox County in order to determine if the documents reflected compliance with the applicable regulations, including the Knox County Zoning Ordinance. If his review showed that the submitted plans were in compliance, he would issue a permit.

Mr. Pierce's immediate supervisor in 1997 was Roy Braden, Supervisor of Codes Administration. Mr. Braden's immediate supervisor was Bruce Wuethrich, who was, at that time, according to Mr. Pierce, either the Director or the Assistant Director of Engineering and Public Works.

On May 12, 1997, Bill Arnett of Far Tower, Patrick O'Connell of Dial Call, and a Tim Burnette met with Mr. Pierce in the Knox County Codes Enforcement Office to discuss the original Permit. Mr. Arnett took his blueprints to the meeting and showed them to Mr. Pierce. Mr. Pierce reviewed the submitted material and said there would be no problem in renewing the original Permit. He specifically stated that he could and would renew the original Permit and that he would put it in Far Tower's name. Mr. Pierce stated that there had been some changes in the setback requirements, but that since the original Permit had been first issued prior to these changes, the original Permit would be "grandfathered" as to the original setback requirements. Mr. Pierce led Far Tower's representative to believe that there were no problems with the Tower Site. Mr. Arnett handed Mr. Pierce a check for a permit and Mr. Pierce handed Mr. Arnett a new permit ("the new Permit"). Mr. Arnett said, "Sir, I want you to know that we're not a company that runs around and begs for forgiveness after we do something wrong. I need to know, is there anything else that we need to do, I want to make sure we've dotted all the i's and crossed the t's," to which Mr. Pierce replied, "No sir you've got the permit, you're good to go, go build it."

On the second page of the new Permit, immediately following Mr. Pierce's signature, is the language "Plans Approved— Knox County Code Administration." Mr. Pierce did not mention the necessity of obtaining a COA, and did not make any reference to the Authority or the Tech Act. Furthermore, he did not indicate that there were any problems with the new Permit or with the transfer of the original Permit.

The base zoning for the Tower Site was agricultural. The zoning noted on the new Permit is "AG."

Mr. Arnett of Far Tower testified that the Tower to be built by Far Tower could physically accommodate as many as five or six cellular carriers, two or three paging carriers, and maybe some ancillary microwave gear, and he hoped to have the Tower at maximum capacity. Mr. Arnett testified that had he been able to build the Tower, it would have generated substantial income, which was the original idea behind the project.

No appeal was filed by anyone with respect to the issuance of the new Permit in Far Tower's name. Section 6.60.05 of the Knox County Zoning Ordinance provides that "[e]very appeal shall be taken within 30 days from the date of the action causing such appeal."

After obtaining the new Permit, Far Tower entered into a lease with Sprint to permit it to hang antennas on the Tower, and it began incurring obligations and spending money for the construction of the Tower. Mr. Arnett testified that had he known there was a problem with the new Permit, he would not have incurred these obligations and spent money on the project. In fact, he testified that he relied upon the new Permit in connection with spending the money and incurring the obligations, and if he had known there were any problems with the new Permit, he would not have gone forward until those problems were corrected.

In reliance upon the new Permit, Far Tower proceeded with the construction of the Tower, incurring the expense of an aeronautical evaluation and FAA filing ($350), a National Environmental Policy Act study ($200), engineering services ($1,000), clearing and grading of the site ($17,272.50), and underground concrete piers on which to affix the legs of the Tower ($43,193). In addition to the foregoing expenditures, which total $62,015.50, Far Tower contracted for the purchase of the prefabricated tower structure for use at the Tower Site, to be manufactured to its specifications, for a price of $60,293. All of these expenditures and contractual commitments represent 100% of the cost of the project, excluding the labor associated with the erection of the Tower, fencing, vegetation and overhead allocations.

After making the foregoing expenditures and contracting for the purchase of the prefabricated tower structure, and subsequent to pouring the footers, Mr. Arnett received a telephone call from Mr. Pierce, who told him that some people living near the Tower Site were unhappy about the Tower. He communicated that these individuals had discovered that Far Tower did not have a COA. Finally, he told Mr. Arnett that Knox County was going to close down the project. Mr. Arnett asked Mr. Pierce "Why," and he replied "Because it was in the Tech Corridor Zone." Before that conversation, Mr. Arnett had never heard of a COA, the Tech Act, or the Authority.

As a result of a complaint by a Mr. Fujii, Bruce Wuethrich of Knox County issued a stop work order on September 8, 1997. The reason for the stop work order was recited to be "Need certificate of appropriateness." No other problems were mentioned on the stop work order.

After receiving the stop work order, Mr. Arnett called his legal counsel and advised her of the stop work order. Counsel then called Mr. Wuethrich, who acknowledged that the County had made a mistake in issuing a permit for the Tower Site, but because of complaints from homeowners in the vicinity, he felt he had no choice but to issue the stop work order.

Far Tower's counsel also spoke to Mr. Michael Moyers, the Assistant County Law Director, who suggested that Far Tower appeal the decision to the Board of

Zoning Appeals ("the BZA"), the board that was set up to review the acts of county officials. The attorney then contacted the office of the BZA. She was told by administrative personnel there that if the stop work order was issued because there was no COA, the BZA did not have jurisdiction to do anything, and it could not waive or set aside any requirements of the Tech Act.

Both Section 5.90.1 of the Knox County Zoning Ordinance and Section 8 of the Tech Act provide that no building permit for construction on property located in the Corridor can be issued prior to the issuance of a COA.

Sprint and Nextel were notified of the stop work order, and they reacted by stating that they could not wait and would have to find tower space elsewhere. Mr. Arnett was concerned that Far Tower would lose Sprint and Nextel as customers. Mr. Arnett was also concerned that Far Tower would lose the Tower Site.

In an attempt to avoid further delay in the construction of the Tower, Far Tower filed an application with the Authority for the issuance of a COA. At a hearing of the Authority's Board of Commissioners on October 22, 1997, one of the Commissioners inquired why Far Tower did not know that the Tower Site was in the Corridor. The minutes reflect that Bruce Wuethrich replied at the meeting "that it was his office that made the error and that generally he did not expect applicants to know specific permitting procedures because that was [Knox County's] job." A motion was made to approve the staff recommendation for the issuance of a COA. Two Commissioners voted in favor of the motion, and two opposed the motion. Consequently, the motion failed for lack of a majority.

Far Tower's application for a COA was again considered at the next meeting of the Authority's Board of Commissioners on November 10, 1997. At that meeting, by a three to two vote, the Board of Commissioners approved the issuance of a COA for the construction of the Tower.

As authorized by Section 11 of the Tech Act, the decision of the Authority's Board of Commissioners to grant a COA was appealed by Mr. Fujii to the Knox County Commission. Mr. Fujii's appeal was heard by that body on December 15, 1997. Prior to the hearing, Mr. Fujii launched a petition drive in his subdivision. The petition asked the Commission to oppose the Tower. The petition, containing 92 signatures, was filed by Mr. Fujii as an exhibit during the hearing. Neighbors in Mr. Fujii's subdivision also attended the hearing in support of the petition.

During the course of the hearing, Mr. Fujii's lawyer argued that none of the permits were valid because they were issued prior to the issuance of a COA, that the original Permit had not been validly renewed or transferred, and that a new permit should not be issued because of new setback requirements imposed by a change in the zoning ordinance subsequent to the date the original Permit was first issued.

Mr. Wuethrich testified at the hearing. Mr. Wuethrich stated that he was the Director of Planning and Development, which was a division of the Engineering/Public Works Department of Knox County, and that codes administration inspection is in his department. Mr. Wuethrich further testified that the original Permit was issued in June, 1995, and that it was renewed in the name of Dial Call. Mr. Wuethrich testified that there was an "in house" policy to grant six-month extensions for permits, and such extensions were routinely granted by his department over the years. Mr. Wuethrich stated that

he had no knowledge of the existence of a "Knox County Board of Adjustments and Enforcements," which is the agency empowered by the language of the Knox County Zoning Ordinance to grant extensions of building permits. To Mr. Wuethrich's knowledge, the "Knox County Board of Adjustments and Enforcements" did not exist. Mr. Wuethrich testified, again as to his knowledge, that no building permit holder had ever gone to such a board for an extension, or for that matter, to the BZA,[3] but rather, building permits have been routinely extended by Mr. Wuethrich's department. With respect to why a COA had not been obtained, Mr. Wuethrich testified "[t]o be quite candid about it, it was a mistake that my office made when they applied for the permit. We should not have issued the permit until we had a COA in hand." Mr. Wuethrich confirmed that the only outstanding deficiency at the time the stop work order was issued was the lack of the COA, and the lack of a COA was the reason for the issuance of the stop work order. Mr. Wuethrich stated that when Far Tower obtained a COA, it was his intent to release the stop work order.

At the conclusion of the hearing before the Commission, a motion was made and seconded to sustain Mr. Fujii's appeal. The motion was unanimously adopted.

Mr. Arnett communicated the Commission's action to Sprint and Nextel, and both stated that they would have to find another tower because they could not wait.

On January 14, 1998, Far Tower instituted an action against Knox County in the United States District Court for the Eastern District of Tennessee at Knoxville, based upon the Telecommunications Act of 1996, 47 U.S.C. § 332.

Fearing the loss of Dial Call and Sprint as tenants, Far Tower determined that it did not have time to wait on the federal court litigation. Accordingly, Far Tower made arrangements for an affiliated company, Flying A Towers Investment Co. 2, LLC, to lease property near the Tower Site from Mr. Gammon upon the same terms and rental amounts as provided for in the original lease between Dial Call and Mr. Gammon (which Dial Call had sublet to Far Tower). This new tower site, having dimensions of 125 feet by 125 feet, complied with the setback requirements enacted subsequent to the issuance of the original Permit. A COA was obtained for the new site and thereafter a building permit was issued for the construction of a tower on the new site. The tower was erected and the agreement with Sprint was maintained. The deal with Dial Call, however, was lost.

Under the new lease between Mr. Gammon and Flying A Towers Investment Co. 2, LLC, the lessee was required to pay $1,000 per month for the initial term, with increases for the option terms.

With the exception of the tower structure, which could be used elsewhere, all of the expenses incurred by Far Tower in connection with the original Tower Site were lost.

Far Tower voluntarily dismissed its United States District Court action against Knox County without prejudice by a stipulation of the parties filed pursuant to Rule 41(a) of the Federal Rules of Civil Procedure on June 29, 1998.

At the bench trial in circuit court,[4] Robert J. Fletcher, a real estate appraiser

---

3. While there is some confusion in the record about this point, the defendants take the position that the "Knox County Board of Adjust-

ments and Enforcements" and the BZA are one and the same.

4. In addition to the federal court litigation and the instant action, Far Tower filed a

testifying as a land use expert, gave testimony regarding the amount of Far Tower's damages. Mr. Fletcher testified that the Tower Site had no economic value and no economically viable use other than as a site for a cellular telecommunications tower. He stated that if the actions of Knox County are determined by the Court to constitute a taking, Far Tower's damages as a result of the taking are as follows: (1) loss of value of leasehold interest in the Tower Site in the amount of $113,500; (2) loss of non-recoverable site specific clearing and grading in the amount of $17,272.50; and (3) loss of non-recoverable underground concrete piers in the amount of $43,193.

## II. *Trial Court's Opinion*

At the conclusion of a plenary hearing, the trial court rendered its opinion from the bench, an opinion thereafter incorporated into the court's judgment. With respect to Far Tower's vested rights theory, the court stated as follows:

> There is no dispute but that the original building permit was invalidly issued because it was issued without the prior issuance of a[COA] in violation of section 5.90.08 of the Knox County Zoning Ordinance, and there's no dispute but that [Far Tower's] claims are based upon a transfer of the permit to it, which would be in violation of section 6.10.05 of the zoning ordinance.
>
> Additionally, the original permit would have appeared to have expired six months after its issuance under Knox County Zoning Ordinance 6.11, no construction other than grading and preliminary

inary site preparation having been conducted.

> Here, under Knox County zoning laws, the building permit appears to have been invalidly issued; but, even if it was validly issued, it appears to have expired; and even if it was validly issued and operative, it appears to have been rendered invalid by the transfer or by the purported transfer.

Relying on a case of this Court, *Moore v. Memphis Stone & Gravel Co.*, 47 Tenn. App. 461, 339 S.W.2d 29 (1959), the trial court stated that, in Tennessee, "a permitee can acquire no vested rights when a permit is issued in violation of the zoning ordinance." The court therefore held that Far Tower acquired no rights in the Permit, as it was "invalidly issued or invalidly renewed or invalidly transferred," and thus, Far Tower "has no rights or property interests upon which to premise this action."

In addressing Far Tower's estoppel argument, the trial court relied upon *Davis v. Metro. Gov't of Nashville & Davidson County*, 620 S.W.2d 532, 535 (Tenn.Ct.App. 1981), which it opined stood for the proposition that every citizen is presumed to know the law and that ignorance of the law is not enough to set aside agreements of the parties. Further, the trial court noted that *Davis* holds that the error or ignorance of a government employee "is equally attributable to the plaintiff" and that accordingly, no "liability can attach under such circumstances." *See id.* at 535–36. The trial court discounted Far Tower's reliance on *Needham v. Beer Bd. of Blount*

---

complaint in chancery court for a writ of certiorari and supersedeas seeking to overturn the judgment of the Knox County Commission reversing the decision of the Authority's Board of Commissioners. That action was dismissed as moot following Far Tower's decision to abandon construction of the Tow-

er on the original site. In the course of its decision in the instant case, the trial court noted that the dismissal was "without any determination that the county commission's action was proper or improper, and without any issue determination or preclusion."

*County,* 647 S.W.2d 226 (Tenn.1983), stressing that, unlike the facts in *Needham,* Far Tower "exercised no independent due diligence [in determining the validity of the permit] except to defer to and blame the county engineer"; the new Permit was not revoked to prevent discrimination as was the case in *Needham;* and Far Tower, unlike the plaintiff in *Needham,* brought an action to recover *damages.*

The trial court next addressed Far Tower's argument that the change in the setback requirements constitutes a taking, stating the following:

> [Far Tower] took no action regarding the setback requirements. [Far Tower] chose to stand fast on its entitlement to be grandfathered in under the preexisting setback requirements which existed at the time of the original issuance of the building permit to [Dial Call].

> [Far Tower] did not seek a variance from [the Authority] or [the BZA] as to those setback requirements. [Far Tower] points to discrepancies in the zoning laws as to references to the [BZA] and the Board of Adjustments leaving it with no direction as to where to go, but [Far Tower] was, in fact, advised by the Knox County law director to go to [the BZA], but no action was taken in that regard.

Finally, with respect to the excessive regulation under the Tech Act, the trial court, referring to the testimony of real estate appraiser Robert J. Fletcher, stated as follows:

> Mr. Fletcher said that he could not comprehend any rational basis for the corridor, for overlaying the corridor or zone over an existing zone, being agriculture. However, upon questioning by the Court, Mr. Fletcher testified that the proponents of [the Tech Act] for the establishment of [the Authority] and zone advanced that the area involved had a special resource of professionals at the University of Tennessee and the Tennessee Valley Authority and that the corridor would attract high-tech industry. That, by itself, sounds to this Court to be a rational basis in that, at least, the issue would be fairly debatable.

> Mr. Fletcher testified that he did not know what debate took place over [the Tech Act]. The Court permitted Mr. Fletcher to testify as an expert in land use, but did not find the testimony to be persuasive as to the argument that [the Tech Act] is unconstitutional.

In concluding, the trial court noted that, during the argument on Knox County's motion to dismiss, Far Tower agreed with the court that, for it to find in favor of Far Tower, the court would effectively "have to hold that a member of the public is entitled to rely upon a Knox County official's advice without doing anything else." The court then stated that it "does not believe that it can hold such under the law and especially in the context of this case." Thereupon, the court dismissed Far Tower's complaint.

### III. *Issues*

Far Tower raises several issues on this appeal:

1. Whether it acquired vested rights under the new Permit so as to be entitled to just compensation when the permit was revoked.

2. Whether it had the right to rely upon the issuance of the new Permit by Knox County, thereby entitling it to recover monies lost by it because of its detrimental reliance on the issuance of the new Permit, based on the fact that Knox County is estopped to deny the validity of the new Permit.

3. Whether a taking occurred as a result of the change in setback require-

ments that occurred following the issuance of the original Permit so as to entitle Far Tower to compensation under the Constitutions of the United States and the State of Tennessee.

4. Whether the Tech Act is unconstitutional as an exercise of excessive regulation on the part of the County so as to entitle Far Tower to compensation under the Constitution of the United States and the State of Tennessee.

## IV. *The Parties' Positions*

Far Tower argues on this appeal that when it expended funds in reliance upon a building permit issued by the Knox County official responsible for the issuance of such permits, it acquired a vested property right in the new Permit. It contends that when it was revoked by the County, the County committed a taking for which Far Tower is entitled to compensation. While acknowledging that the Tech Act and the Knox County Zoning Ordinance require the issuance of a COA prior to the issuance of a building permit, Far Tower argues that the validity of its permit is not material once it appears it was issued by the appropriate county official and that no appeal from the issuance of the new Permit was taken within the prescribed period of time.

As an additional argument, Far Tower contends that the Tennessee Supreme Court in *Needham* pronounced the principle that a governmental entity is estopped to deny the validity of a permit when the individual or entity to which it was issued relies upon the permit to its financial detriment.

Finally, Far Tower argues that the Tech Act constitutes excessive regulation amounting to an "inverse condemnation," but only insofar as it impacts property within the Corridor that is zoned agricultural, as is the subject tract. It asks us to apply the doctrine of elision to declare unconstitutional and excise only that part of the Tech Act applicable to property zoned agricultural. As an additional constitutional argument, Far Tower contends that

[f]ollowing the creation of the leasehold estate and issuance of the Permit to Dial Call, and after the expenditure of non-recoverable sums, changing the setback requirements [from 35 feet to 113 feet, 4 inches] to prohibit the construction of the Tower at the original location on the Tower site had the effect of taking the Tower Site by destroying investment-backed expectations for the site.

As a result, Far Tower argues that it is entitled to recover "for the value of its out-of-pocket expenses incurred prior to the issuance of the stop work order, and for the value of its leasehold estate." Far Tower contends that its loss, as expressed through the testimony of Mr. Fletcher, amounts to $173,965.50.

The defendants take sharp issue with Far Tower's positions. They contend that the new Permit issued to Far Tower was invalid for a number of reasons and that this invalidity precludes Far Tower from obtaining vested, constitutionally-protected rights under it. They argue that the doctrine of estoppel cannot be invoked against them as a predicate to an award of money damages for a taking. They deny Far Tower's claim of a taking and strenuously contend that the Tech Act is constitutional and that its invocation against Far Tower cannot be construed as a taking. They make other arguments that we do not need to address in view of our decision in this case.

## V. *Standard of Review*

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a

presumption of correctness as to the trial court's factual determinations that we must honor unless the evidence preponderates otherwise. Tenn. R.App. P. 13(d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn.1995); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993). Our review of questions of law is *de novo* with no such presumption of correctness attaching to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn.1993).

## VI. *Discussion*

### A. In General

In fairness to both sides, particularly Far Tower, this opinion contains an unusually long statement of the facts. This statement clearly reflects that a number of the critical (to one side or the other, if not both) facts are undisputed: a cellular telecommunications tower at the Tower Site, being in an agricultural zone, was an authorized use under the Knox County Zoning Ordinance; the original Permit was issued by the appropriate county official; he renewed it believing he had the authority to do so; he also issued the new Permit, again believing he was authorized to do so; the same county official assured Far Tower that once the permit was issued, Far Tower then had all the authority it needed to build the Tower; Far Tower relied upon the new Permit and the assurances of the county official in deciding to move forward with the construction of the Tower; it expended considerable monies in doing so, believing at all times that it had the legal authority to proceed with construction at the Tower Site; Far Tower would not have expended these monies had it known that it did not have full legal authority to build the Tower; Far Tower had no knowledge of the Tech Act, the Authority, or the Corridor or the relevance of any of that to its project; and Far Tower lost considerable sums as a result of the stop work order.

In addition to the foregoing facts, other facts—clearly not favorable to Far Tower—are likewise undisputed. Other than seeking the advice and assurances of the responsible county official, Far Tower did not undertake any independent due diligence with respect to the legal requirements under the Knox County Zoning Ordinance and the Tech Act pertaining to the construction of a cellular telecommunications tower at the Tower Site; had a representative of Far Tower consulted these source documents, Far Tower would have learned that a COA was a prerequisite to the issuance of a permit to build a cellular telecommunications tower; the original Permit was not validly issued; the county official who issued and renewed the original Permit exceeded his authority in doing so; and he was also without legal authority to transfer the permit to Far Tower or issue the new Permit in Far Tower's name.

While the material facts in this case are essentially undisputed, the parties sharply disagree as to the legal effect of those facts. What is clear is that Far Tower's suit is one for damages based upon an alleged *taking* of its property. Far Tower relies upon the "taking" provisions of the United States Constitution[5] and the Constitution of Tennessee.[6] As we view this

---

**5.** The Fifth Amendment to the federal constitution provides that "nor shall private property be taken for public use, without just compensation." It is applicable to the states through the Fourteenth Amendment. *See*

*Penn. Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 122, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978).

**6.** Article I, § 21 of the Tennessee Constitution provides as follows:

case, Far Tower's issues raise four core questions:

1. Did Far Tower have a vested property right in its permit?

2. Are the defendants estopped from denying the validity of Far Tower's permit?

3. Did the change in the setback requirement from 35 feet to 113 feet, 4 inches impermissibly infringe on Far Tower's property interest so as to amount to a taking of its property?

4. Does the Tech Act amount to excessive regulation so as to effectively amount to a taking of Far Tower's property interest in the Tower Site?

### B. Vested Property Interest

In arguing that it acquired a vested property right in the new Permit, Far Tower relies upon the Tennessee Supreme Court case of *Howe Realty Co. v. City of Nashville*, 176 Tenn. (12 Beeler) 405, 141 S.W.2d 904 (1940). Far Tower particularly relies upon the Supreme Court's quote taken from "43 C.J. 349":

> But when once the proper authorities grant a permit for the erection or alteration of a structure, after applicant has made contracts and incurred liabilities thereon, he acquires a kind of property right on which he is entitled to protection; and under such circumstances it is generally held that the permit cannot be revoked without cause or in the absence of any public necessity for such action.

*Howe Realty Co.*, 141 S.W.2d at 906.

In the *Howe Realty Co.* case, the Supreme Court noted that the property owner, after obtaining a building permit for "a filling station" to be constructed by Shell Oil Company, had failed to undertake any construction. *Id.* This being the case, the Court concluded that "[i]t [was] unnecessary ... to determine ... the extent of construction necessary to constitute a vested right...." *Id.* at 907. Since the High Court held, under the applicable ordinance, that the City of Nashville had the authority to recall the permit and since there had been no construction before the recall was issued, the Court determined that an ordinance enacted after the issuance of the permit, which ordinance prohibited the location of a service station on the plaintiff's property, was valid and applicable to the plaintiff's property. *Id.*

Far Tower also relies upon our unreported decision in the case of *PEP Properties v. Town of Farragut*, C/A No. 1399, 1991 WL 50211 (Tenn. Ct.App., E.S., filed April 10, 1991), *perm. app. denied* September 9, 1991. *PEP Properties* cites *Howe Realty Co.* in support of the *PEP Properties* Court's statement that "Tennessee has consistently adhered to the rule that private rights do not vest until substantial construction or substantial liabilities have been incurred." *Id.*, 1991 WL 50211 at *2.

Far Tower argues that these cases stand for the proposition that there are only two requirements to establish a vested right in a permit issued by a governmental entity: the issuance of the permit by the responsible governmental agency and the making of contracts and the incurring of substantial liabilities in reliance on the permit. It further argues that, since neither case expressly states that the permit must be *validly* issued, the validity of the issuance of the permit is immaterial.

Neither of the cited cases supports Far Tower's position for the simple reason that the invalidity of the issuance of the permit

That no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives, or without just compensation being made therefor.

was not at issue in either case. Furthermore, neither case *expressly* holds that the vested rights doctrine applies whether the permit is validly issued or not. Thus, while we do not disagree with the holding or rationale of these cases, we hold that neither supports Far Tower's position or is of any help to us in addressing the effect of an invalidly-issued permit such as the one in the case at bar.

We agree with the trial court that the question now under discussion is controlled by our decision in *Moore.* In that case, a county official issued a permit authorizing the defendants to excavate and mine gravel in an agricultural district. *Id.,* 339 S.W.2d at 30–31. Neighboring landowners filed suit seeking an injunction against the described activity on the defendants' property. *Id.* at 32. The trial court granted the plaintiffs an injunction based, in part, upon the fact that the permit had been issued in violation of the local zoning ordinance. *Id.* at 30. The Court of Appeals affirmed and the Supreme Court denied permission to appeal. *Id.* at 29.

In *Moore,* the defendants relied, as does Far Tower in the instant case, on the *Howe Realty Co.* case. In rejecting the defendants' vested property right argument, we noted in *Moore* as follows:

> Thus it clearly appears that the County Building Commissioner was authorized to issue permits only for the erection of buildings and the uses of property which were permitted by the Zoning Ordinance and that the variations and modifications of the provisions of the Zoning Ordinance could be authorized only by the Board of Adjustment. Therefore, the insistence that the appellants received a vested right under the building permit is respectfully overruled.

*Id.,* at 35. E.C. Yokely, *Zoning Law and Practice,* 4th ed., Vol. 2, § 14–6, is to the same effect.

Far Tower urges us to follow the decision of the Supreme Court of Pennsylvania in the case of *Petrosky v. Zoning Hearing Bd. of Township of Upper Chichester,* 485 Pa. 501, 402 A.2d 1385 (1978). In a 5–1 decision, with one of the judges in the majority "concurr[ing] in the result," *id.,* 402 A.2d at 1391, the Supreme Court referred to a decision of an inferior Pennsylvania court—"the Commonwealth Court"—which in turn referred to "Ryan, in his scholarly work." [7] *Id.* at 1388. The Commonwealth Court, as quoted favorably by the Supreme Court, had stated the following:

> Ryan, in his scholarly work, discusses the applicability of the vested right doctrine to situations where a municipality has erroneously issued a building permit. His conclusion at Section 8.3.2 seems to be that after the appeal period has expired and the owner has incurred significant non-recoverable costs in reliance on the permit, the owner's good faith reliance on the permit should afford him a vested right to complete the work, albeit the permit was issued in error.

*Id.* In *Petrosky,* the Township, after issuing a building permit for a garage, had determined that the constructed garage, which had been built in accordance with the plans submitted with the application for the permit, violated the setback requirements. *Id.* at 1387. It notified the property owners and "ordered [them] to remove the garage or alter it to comply with the setback requirements." *Id.*

The Supreme Court of Pennsylvania agreed with the earlier Commonwealth

---

**7.** This "scholarly" work is not otherwise identified.

Court decision[8] that there were five factors that must be considered in determining whether one has acquired a vested property right in a permit issued by a governmental entity:

1. his due diligence in attempting to comply with the law; 2. his good faith throughout the proceedings; 3. the expenditure of substantial unrecoverable funds; 4. the expiration without appeal of the period during which an appeal could have been taken from the issuance of the permit; 5. the insufficiency of the evidence to prove that individual property rights or the public health, safety or welfare would be adversely affected by the use of the permit.

*Id.* at 1388.

In *Petrosky,* the Supreme Court of Pennsylvania concluded that the five factors weighed in favor of a finding that the property owners had acquired a vested right in the building permit even though the Township had determined, seven months after the property owner finished constructing their garage, that the construction was in violation of the setback requirements of the zoning ordinance. *Id.* at 1385, 1390.

Obviously, the first of the five factors—the property owner's due diligence, or lack thereof in attempting to comply with the law—is the factor most at issue in Far Tower's case.[9] As particularly pertinent to the issue under discussion in the instant case, the High Court in Pennsylvania said the following:

[The Township] argues that [the property owners] failed to exercise due diligence because they did not research the

zoning laws and discover for themselves the setback requirements. We reject the notion that a citizen who does attempt to check the zoning statutes *by making inquiry of the proper officials,* who certainly should be expected to have knowledge about zoning, has not exercised due diligence.

*Id.,* 402 A.2d at 1388 (emphasis added). Continuing later in its opinion, the High Court opined as follows:

[The property owners] relied on their local government to know about and to enforce local zoning and building ordinances. [The property owners] acted in the belief that if they followed exactly their government's instructions, they would be acting lawfully. Under these circumstances, we cannot hold that this reliance on government representations amounts to a self-inflicted hardship.

*Id.,* 402 A.2d at 1389.

There are a number of factual differences between *Petrosky* and the instant case. In *Petrosky,* the Township's building inspector visited the construction site at least three times and on one of the visits "gave advice concerning the proper location of footings for the building." *Id.* at 1387. In the case at bar, the defendants do not appear to have had such hands-on involvement after the issuance of the new Permit. In the Pennsylvania case, the permitted construction had been completed for some seven months when the Township attempted to revoke the permit, *id.;* in the case at bar, on-site work remained to be done when the stop work order was issued. In *Petrosky,* the property owners were seeking a declaratory judgment that

---

**8.** *See Dept. of Envtl. Res. v. Flynn,* 21 Pa. Cmwlth. 264, 271, 272, 344 A.2d 720, 724–25 (1975).

**9.** We note, in passing, that the fifth factor is not one which, even if it were found to be

applicable in Tennessee, was developed to any extent in the proof below in the instant case or otherwise argued on appeal or, apparently, even addressed by the trial court below.

would allow them "to maintain the existing use of their property." *Id.* In the instant case, Far Tower is seeking money damages based upon an alleged taking of their property in violation of the United States and Tennessee Constitutions. There is no indication in *Petrosky* that, had the property owners there been seeking money damages for a taking of their property, the Supreme Court of Pennsylvania would have countenanced such a cause of action based upon a vested rights theory. It is one thing to say that a property owner, because of a governmental entity's mistake, does not have to tear down completed construction. It is an entirely different thing to state that the entity's conduct results in a taking entitling the property owner to money damages.

We recognize that *Petrosky* clearly states that a property owner exercises due diligence when it makes "inquiry of the proper officials." *Id.* at 1388. While a decision of the highest court of a sister state is worthy of note, it is clearly not controlling on us. We decline to adopt, as an absolute proposition, that a citizen can rely upon the advice and action of a mid-level local county official pertaining to a zoning matter within that official's area of responsibility in lieu of *any* independent research. It is certainly conceivable that such an official might not be well-versed in the legal intricacies of a thick zoning ordinance. It goes without saying that such officials are of varying levels of education, training, intelligence, competence, and, most importantly, knowledge and comprehension of the law pertaining to their official duties. The ramifications of the broad "due diligence" proposition stated in *Petrosky* are too significant to prompt us to depart from the established precedent in the *Moore* case. If there is to be a departure from *Moore*, we believe it must come from the General Assembly or the Supreme Court. In any event, we feel bound by the well-established precedent set 44 years ago in *Moore*. We certainly are not willing to reject the holding in *Moore* as a prelude to accepting *Petrosky's* due diligence principle in support of a holding in the instant case that Far Tower is entitled to money damages for a taking of its property.

■ In the instant case, as previously noted, Far Tower does not contest the obvious—all of the permits issued by Knox County in this case, the one issued to Far Tower as well as the ones issued to and renewed for the benefit of Dial Call, were issued in violation of the Tech Act and the Knox County Zoning Ordinance, *i.e.*, they were all issued prior to the issuance of a COA. We agree with Chancellor Weaver that Far Tower could not and did not obtain a vested property right in the new Permit. In view of this holding, we do not find it necessary at this point to explore the arguments of the parties regarding whether the renewals of the original Permit or the transfer of the permit from Dial Call to Far Tower were renewed/transferred in compliance with other provisions of the Tech Act and the Knox County Zoning Ordinance.

In summary, we hold that the issuance of a COA was a prerequisite to the issuance of a valid building permit; that Far Tower's failure to obtain a COA before seeking the permit renders the issued permit invalid and inoperative; and that Far Tower acquired no vested property right in and under the invalidly-issued permit.

### C. Estoppel

Far Tower next argues that the defendants, by their actions, are estopped from denying the validity of the new Permit. We disagree.

In the case of *Haymon v. City of Chattanooga*, 513 S.W.2d 185 (Tenn.Ct.App.

1973), we addressed the subject of equitable estoppel thusly:

> The principle is well established that where both parties have the same means of ascertaining the true facts there can be no estoppel. It is essential, as a general rule, to the application of the principle of equitable estoppel, that the party claiming to have been influenced by the conduct or declarations of another to his injury, was himself not only destitute of knowledge of the state of the facts, but was also destitute of any convenient and available means of acquiring such knowledge, and that where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel. It is proper to add that, generally, the doctrine of estoppel does not apply to acts of public authorities.

*Id.* at 188–89 (citations omitted) (internal quotation marks omitted). These general rules are not without exceptions. In the case of *City of Lebanon v. Baird*, 756 S.W.2d 236 (Tenn.1988), the Supreme Court observed as follows:

> In some cases, if the City does an act that does not comply with the law controlling the manner in which it is to be done, the city will be estopped from denying the validity of its act for equitable considerations arising on the facts of the particular case, usually because the city has accepted the benefits of an act it induced another to perform, or because the city induced a detrimental act of another, . . . .
>
> . . . .
>
> Ultimately, the application of estoppel or implied contract must be determined on the facts and equities of the particular case. The principles of estoppel are well settled and not every case will require application of estoppel or of implied contract.

*Id.* at 242, 244 (citations omitted).

In the "estoppel" part of its brief, Far Tower places great emphasis on the Supreme Court decision in *Needham v. Beer Board of Blount County*, 647 S.W.2d 226 (Tenn.1983). In *Needham*, two owners of beer permits issued by Blount County in 1970 and 1978 respectively filed separate petitions for writ of certiorari on December 1, 1980, seeking to overturn a November 6, 1980, decision of the Blount County Beer Board revoking the plaintiffs' beer permits. *Id.*, at 227, 229. The Beer Board had revoked the permits because it found that they had been originally issued in violation of the county's ordinance prohibiting the sale of beer within 2,000 feet of a church or school. *Id.* At the hearing before the trial court in *Needham*, the testimony reflected that, when the permits were originally issued, the general practice had been to measure distance by use of an automobile. *Id.* at 228–29. It was uncontradicted that, as so measured, each proposed location was more than 2,000 feet from a church or school. *Id.* at 231. In revoking the two permits, the Beer Board had relied upon its new practice—apparently since a new ordinance was adopted in October, 1980—of measuring the "straight line distance between the two closest points." *Id.* at 230.

The trial court in *Needham* granted the plaintiffs relief, holding that the county had waived the provisions of the 2,000-foot rule and could not now rescind the prior issuance of the permits. *Id.* at 228. The trial court also relied upon the doctrine of laches to support its holding. *Id.*

The Supreme Court, invoking its equitable jurisdiction, *id.* at 228, affirmed the trial court's judgment as to the two plain-

tiffs,[10] referring to "the unusual facts of this present case." *Id.* at 228 n. 1. With respect to the "measuring" issue, the Supreme Court noted as follows:

It should be noted at this point that, had Plaintiffs Needham and Humphreys been instructed by the Board to use the straight line method in measuring the respective distances, it would have been near impossible for them to do so without the assistance of experts. A straight line between the closest corners of the Baptist church and Needham's package store passes over a "very large ravine." And a straight line between the closest corners of the middle school and Humphreys' Jolly Giant convenience store passes over a subdivision fence, two roads, eight pieces of private property, and an eight-foot chain link fence with two strands of barbed wire on top.

*Id.* at 230. In affirming the trial court, the Supreme Court elected to use a basis other than those chosen by the trial court:

Plaintiffs Needham and Humphreys would not have expended large sums of money and constructed or had remodeled a building, unless the beer permit had been issued by the Board. The method of measuring distances at that time showed Plaintiffs in compliance with the 2,000 foot rule. The permits were not issued through misrepresentation by the Plaintiffs, but by mutual mistake as to how the distances should be properly measured.

We do not base our opinion on waiver or laches as did the Chancellor, because we do not believe the facts support such a holding. *Plaintiffs Needham and Humphreys relied on the license to their detriment and we are of the opinion that the revocation of their licenses would create a significant hardship and*

*would be unjust. We, therefore, hold that Plaintiffs Needham and Humphreys have established a sufficient hardship and detrimental reliance to warrant an exception to the Blount County 2,000 foot rule.*

*Id.* at 231 (emphasis added).

Contrary to Far Tower's belief, the Supreme Court in *Needham* did not bottom its holding on estoppel. Rather, that court held the plaintiffs "ha[d] established a sufficient hardship and detrimental reliance to warrant an exception to the Blount County 2,000 foot rule." That is not the issue before us. While that issue is one that Far Tower arguably could have espoused in its certiorari action, it chose not to pursue its claim of detrimental reliance and hardship in that litigation. It also did not seek a variance before the BZA as it arguably had the right to do under the Knox County Zoning Ordinance. We recognize that Far Tower dismissed its certiorari action for business reasons and in an attempt to mitigate its damages; however, none of that changes the fact that the holding in *Needham* pertains to an issue—detrimental reliance and hardship justifying an exception or variance—that is simply not before us in this case.

 We find no support in *Needham* for a holding of estoppel so as to prevent the defendants from arguing that Far Tower did not have a vested property right in the new Permit when the stop work order was issued. In the case at bar, Far Tower and the defendants both had access to the Tech Act and the Knox County Zoning Ordinance. Both documents were in the public domain. As we have previously noted, when both parties have "the same means of ascertaining the true facts there can be no estoppel." *Haymon,*

10. The case was remanded to the trial court for further proceedings as to the similar claim of a third plaintiff in the other consolidated case. *Id.* at 231.

513 S.W.2d at 188. There is nothing in this case to take it out of the *general* rule that "the doctrine of estoppel does not apply to acts of public authorities." *Id.* at 189.

We again note that this is a suit for money damages based on a taking. Neither *Needham* nor any other Tennessee authority of which we are aware supports Far Tower's claim of estoppel as a legal predicate to an award of damages in a "taking" case.

### D. Setback Requirements

Far Tower contends that the change in the setback requirements—from 35 feet to 113 feet, 4 inches—between the time that the original Permit was issued and when the new Permit was issued amounts to a taking of its vested property right. As we have previously noted, the issuance and renewals of the original permit, having been accomplished before a COA was issued, were invalid and, hence, for the reasons set forth earlier in this opinion, did not result in a vested property interest in Dial Call, and certainly not in Far Tower, who was not the permittee on any of these permits. Furthermore, we agree with the defendants that the attempted transfer of the original Permit, as subsequently "renewed" by Dial Call, was contrary to the Knox County Zoning Ordinance. It results that the setback requirement of 113 feet, 4 inches was in place and in effect when the new Permit was issued to Far Tower. Hence, the new setback requirement cannot, in any way, be construed as a taking of a vested property right.

### E. Excessive Regulation

■ Finally, Far Tower argues that the Tech Act, to the extent it applies to property in the Corridor zoned agricultural, amounts to excessive regulation and a taking of Far Tower's property. It relies upon a number of cases, both Tennessee appellate court decisions and decisions of the United States Supreme Court for the proposition that the government cannot enact land use regulations "in such manner as to deny the owner the beneficial use [of its property]." *Bayside Warehouse Co. v. City of Memphis,* 63 Tenn.App. 268, 276, 470 S.W.2d 375, 378 (1971). *See also Penn Central Transp. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

Both parties cite and rely upon the decision of the Supreme Court in the case of *McCallen v. City of Memphis,* 786 S.W.2d 633 (Tenn.1990). In *McCallen,* the Court quoted extensively from its earlier decision in *Fallin v. Knox County Board of Comm'rs,* 656 S.W.2d 338 (Tenn.1983):

> In enacting or amending zoning legislation, the local authorities are vested with broad discretion and, in cases where the validity of a zoning ordinance is fairly debatable, the court cannot substitute its judgment for that of the legislative authority. If there is a rational or justifiable basis for the enactment and it does not violate any state statute or positive constitutional guaranty, the wisdom of the zoning regulation is a matter exclusively for legislative determination.

> In accordance with these principles, it has been stated that the court should not interfere with the·exercise of the zoning power and hold a zoning enactment invalid, unless the enactment, in whole·or in relation to any particular property, is shown to be clearly arbitrary, capricious, or unreasonable, having no substantial relationship to the public health, safety, or welfare, or is plainly contrary to the zoning laws.

*Id.* at 342–43.

We find no evidence of excessive regulation of the nature discussed in the authori-

ties cited by Far Tower. The Tech Act was enacted to address the unique opportunities for technical and scientific development presented by a stretch of land located generally between the scientific community of Oak Ridge and the City of Knoxville, home to the University of Tennessee and the Tennessee Valley Authority and their substantial technical and scientific research capabilities. We agree with the following comments expressed in the defendants' brief:

> The Plaintiff[ ] argue[s] that the [Tech Act], Chap. 143 of the Private Acts of 1983, is unconstitutional, relying for [its] argument in a novel fashion upon the testimony of a real estate appraiser. Although Mr. Fletcher's legal conclusions regarding the constitutionality of the Act were allowed, improperly in the opinion of the [Defendants] and over the [Defendants'] strenuous and continuing objections, ... the [Defendants] would submit that the learned Chancellor properly found the testimony of a real estate appraiser on the issue of the Act's constitutionality unpersuasive, and further properly held the Act to be constitutional.

\* \* \* \*

The Plaintiff[ ] conclude[s] based on the real estate appraiser's testimony that the Act is not substantially or rationally related to protection of the public health, safety and welfare, and imposes burdens upon affected property owners in excess of the benefits derived by the public as a whole. The Plaintiff[ ] further conclude[s] that the provisions of the Act do not substantially advance legitimate state interests. However, it is clear that the State of Tennessee has an interest and even a constitutionally-imposed duty to encourage internal development. Thus, Article XI, § 10 of the Tennessee Constitution imposes a positive duty upon the State to develop the resources of the State to "promote the happiness and prosperity of her citizens." In furtherance of this Constitutional mandate, the Legislature has for example enacted the provisions of T.C.A. § 13–16–201 [ (2001) ], authorizing local governments to condemn a property and issue bonds for the creation of industrial parks. Further, at T.C.A. § 13–16–301 [ (2001) ], the Legislature creates a Tennessee Industrial Development Authority, empowered to engage in a variety of industrial development projects and to issue bonds in furtherance of those projects. Throughout the Tennessee Code, one finds examples of the Tennessee Legislature enacting provisions designed to encourage internal development in the State.

In the Act in question, the Legislature first declares the need in a specific area of Knox County for improved management of the natural and man-made resources required for the attraction, expansion and continued support and nurture of high technology-based economic development. In furtherance of that stated goal, which is not alleged to be unconstitutional by the plaintiff[ ], the Legislature created a High Technology Overlay Zone and an Authority to regulate that zone to make certain that businesses and uses within the zone are consistent with the purpose of the Legislature, that being the encouragement of the development of a High Technology corridor in the area placed within the High Technology Overlay Zone. The Defendants would submit that the State has a constitutional right and duty to encourage internal development, and that under the holding in **McCallen** the method by which the Legislature has chosen to fulfill this duty in Knox County, the Corridor De-

velopment Act, is at the very least "fairly debatable." The Legislature has clearly stated a constitutional goal, internal development, and has carefully crafted a narrowly tailored procedure to accomplish that goal. To the extent that property owners within the Technology Overlay zone are more burdened than property owners outside that zone, they are in no different position than property owners in a residential zone find themselves in comparison to property owners in an industrial zone. The entire purpose of zoning is to regulate and restrict development to appropriate locations. The Legislature has declared that the area under the Technology Overlay zone is appropriate for High Technology development. To allege that this finding and declaration is unconstitutional because it places a greater burden on property owners within the area than property owners outside the area is to question the constitutional foundation of the entire concept of zoning and land use planning.

We recognize that Far Tower is only arguing the "arbitrary, capricious, and unreasonable" nature of the Tech Act as it applies to property within the Corridor zoned agricultural. It seems obvious to us that it would be counter-productive to the aim of the comprehensive nature of the Tech Act to exclude pockets of property within the Corridor from the ambit of its reach. The goal was to place an overlay over a large area of land so as to encourage scientific and technical development within the whole of that area. Extracting tracts here and there because of their *present* agricultural zoning ignores the very real possibility that such tracts will be presented for appropriate rezoning in the future. The Tech Act does not amount to excessive regulation.

This issue is found adverse to the defendants.

## VII. *Conclusion*

The judgment of the trial court is affirmed. Costs on appeal are taxed to Far Tower Sites, LLC. This case is remanded to the trial court for collection of costs assessed below, pursuant to applicable law.

## OPINION AND ORDER

Far Tower, the appellant in this case, has filed a petition for rehearing pursuant to Tenn. R.App. P. 39. It contends that we misconstrued its issue pertaining to Knox County's change in the setback requirements. According to Far Tower, the issue raised by it

turns on the fact that the imposition of the new setback regulations had the effect of denying all economically beneficial and productive use of the Tower Site, thus entitling Far Tower to compensation as the new setbacks rendered the Tower Site worthless, denying all investment-backed expectations, and effecting a "taking" of the property.

Far Tower argues that the "building permit, valid or not, had no [e]ffect on the legal proposition forwarded by Far Tower in its original brief on this particular issue." We disagree.

Far Tower is not in a position to argue the "taking" issue as framed by it in the petition for rehearing. The setback requirements applicable to the Tower Site were changed in October, 1995. Hence, the new setback requirements were in effect long before Far Tower entered into the sublease with Dial Call on March 31, 1997. When Far Tower acquired its leasehold interest in the Tower Site, it did so subject to the then-existing setback requirement of 113 feet plus. The only way that it can hope to establish standing, and argue the taking issue alluded to in the petition for rehearing, is to demonstrate

that it is entitled to rights based upon Dial Call's May 10, 1995, lease and the building permit purportedly issued to and renewed by Dial Call prior to the effective date of the new setback requirements in October, 1995. As we explained in our original opinion, neither Far Tower nor Dial Call acquired a vested property interest of any kind in any of the "issued" building permits. Furthermore, when Far Tower first acquired its interest in the leasehold, it was fully chargeable with notice of the new setback requirements.

While we may not have directly addressed the subject issue as framed by Far Tower, our determination that Far Tower had no rights as a result of the permit issued to Dial Call and ostensibly renewed by that entity is a complete defense to Far Tower's taking issue as it pertains to the change in the setback requirements.

We adhere to our original opinion as modified by the addition of the thoughts expressed in this opinion and order.

Except as addressed herein, the petition for rehearing is denied at the petitioner Far Tower's costs.

IT IS SO ORDERED.